IN THE SUPREME COURT OF MISSISSIPPI

NO. 94-DP-00524-SCT

*EDDIE LEE HOWARD, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/94 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ARMSTRONG WALTERS |
| | DONNA S. SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | BY: LESLIE STAEHLE LEE |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | REVERSED AND REMANDED - 6/26/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/17/97 |

EN BANC.

DAN LEE, CHIEF JUSTICE, FOR THE COURT:

## STATEMENT OF THE CASE

¶1. This death penalty case concerns questions of waiver of counsel, right to self-representation, use of standby counsel, and due process of law that assures a fair trial was afforded in which we have confidence that justice was done. Under the circumstances of this case, we are not so assured. Therefore, we are left no alternative but to reverse.

¶2. On August 13, 1992, a Lowndes County grand jury indicted Eddie Lee Howard, a forty-one year

old male, on a charge of capital murder in the death of Georgia Kemp, an eighty-two year old female. The indictment charged that the murder occurred during the course of the crime of rape committed on February 2, 1992. Trial on this charge began on May 9, 1994, with Howard acting as his own counsel. The jury returned a guilty verdict on May 12, 1994. At the subsequent sentencing hearing, the State presented evidence of aggravating circumstances and argued that the death penalty was warranted. The jury returned the same day with a sentence of death. The trial court then sentenced Howard to die by lethal injection and set an execution date of June 27, 1994. Following the denial of a motion for new trial, Howard perfected this appeal, and execution was stayed pending this Court's consideration of the issues. The defendant assigns the following as error:

## PRE-TRIAL ISSUES

**I. THE CIRCUIT COURT ERRED IN PERMITTING EDDIE HOWARD TO ACT AS HIS OWN ATTORNEY AT TRIAL.**

**II. DEFENSE ATTORNEYS BURDINE AND STONE FAILED TO PROVIDE DEFENDANT WITH CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL DURING PRETRIAL PROCEEDINGS AND THIS INEFFECTIVE REPRESENTATION SERIOUSLY PREJUDICED EDDIE HOWARD'S DEFENSE.**

**III. THE TRIAL COURT ERRED IN FAILING TO SUMMON A SPECIAL VENIRE DESPITE THE ABSENCE OF A PERSONAL WAIVER BY THE ACCUSED.**

**IV. IT WAS IMPROPER FOR THE COURT TO EXCUSE NUMEROUS VENIRE MEMBERS PRIOR TO TRIAL OUTSIDE THE PRESENCE AND WITHOUT THE KNOWLEDGE OR CONSENT OF EDDIE HOWARD OR HIS STANDBY COUNSEL.**

**V. EDDIE HOWARD WAS DENIED HIS RIGHT TO A SPEEDY TRIAL UNDER STATE AND FEDERAL LAW.**

**VI. MR. COLEMAN SHOULD NOT HAVE BEEN ALLOWED TO SERVE ON THE JURY, IN LIGHT OF SUBSTANTIAL EVIDENCE THAT HE WAS NOT ABLE TO DECIDE THE CASE IMPARTIALLY.**

**VII. THE TRIAL JUDGE IMPROPERLY EXCUSED NUMEROUS BLACK PROSPECTIVE JURORS FOR CAUSE, DESPITE THE ABSENCE OF EVIDENCE OF FIXED BIAS OR ANY OTHER BASIS FOR REMOVAL.**

**VIII. THE DISTRICT ATTORNEY USED HIS PEREMPTORY CHALLENGES TO DISCRIMINATE AGAINST VENIRE MEMBERS ON THE BASIS OF RACE AND GENDER.**

## GUILT PHASE ISSUES

**IX. THE GUILT STAGE INSTRUCTIONS WERE FUNDAMENTALLY FLAWED.**

**A. IT WAS ERRONEOUS AND SEVERELY PREJUDICIAL FOR THE COURT TO DENY DEFENDANT'S REQUEST FOR A LIMITING INSTRUCTION DIRECTING**

JURORS NOT TO CONSIDER EVIDENCE OF HIS PRIOR ASSAULT WITH INTENT TO RAPE CONVICTIONS AS PROPENSITY EVIDENCE OF GUILT.

B. THE CIRCUIT COURT'S CHARGE ON RAPE FAILED TO INFORM JURORS THAT SEXUAL INTERCOURSE WAS AN ESSENTIAL ELEMENT OF OR OTHERWISE PROPERLY DEFINE THIS CRIME.

X. THE LOWER COURT VIOLATED THE DEFENDANT'S RIGHT TO COUNSEL WHEN IT REFUSED HIS REQUEST THAT HIS STAND BY (sic) COUNSEL BE ALLOWED TO GIVE THE DEFENSE'S CLOSING ARGUMENT AT THE GUILT INNOCENCE PHASE.

XI. THE STATE FAILED TO OFFER LEGALLY SUFFICIENT EVIDENCE THAT THE VICTIM HAD BEEN RAPED, AN ESSENTIAL ELEMENT OF THE CHARGE.

XII. THE DISTRICT ATTORNEY ENGAGED IN SEVERAL SERIOUS INSTANCES OF MISCONDUCT IN HIS GUILT PHASE SUMMATION.

A. IT WAS IMPROPER FOR THE STATE TO URGE JURORS TO CONSIDER HEARSAY ACCUSATIONS ABOUT EDDIE HOWARD BITING HIS GIRLFRIEND AND THREATENING ANOTHER WOMAN AS SUBSTANTIVE EVIDENCE OF HIS GUILT.

B. THE DISTRICT ATTORNEY FALSELY TOLD JURORS THAT BITE MARK COMPARISONS WERE AS CERTAIN AND RELIABLE AS FINGERPRINT EVIDENCE.

C. THE PROSECUTOR BLATANTLY AND PREJUDICIALLY MISSTATED THE EVIDENCE WHEN HE TOLD JURORS THAT EDDIE HOWARD HAD DISPLAYED KNOWLEDGE OF THE VICTIM'S HOME THAT COULD ONLY HAVE BEEN GAINED THROUGH PARTICIPATION IN THE OFFENSE.

XIII. THE STATE'S PATHOLOGIST, STEVEN HAYNE, INVADED THE JURY'S PROVINCE AND OTHERWISE GAVE UNRELIABLE, IMPROPER TESTIMONY WHEN HE CLAIMED THAT CERTAIN INJURIES TO THE VICTIM'S VAGINA WERE CONSISTENT WITH RAPE.

XIV. TESTIMONY FROM THE STATE'S DENTAL EXPERT, MICHAEL WEST, CLAIMING TO HAVE POSITIVELY MATCHED EDDIE HOWARD'S TEETH TO A BITEMARK ON THE VICTIM'S BODY WAS CONSTITUTIONALLY UNRELIABLE, AS IT IS WELL-ESTABLISHED IN THE SCIENTIFIC COMMUNITY THAT SUCH COMPARISONS ARE NOT POSSIBLE.

XV. IT WAS REVERSIBLE ERROR TO ADMIT STATE'S EVIDENCE OF DENTAL IMPRESSIONS TAKEN FROM EDDIE HOWARD BECAUSE THESE WERE THE PRODUCT OF AN ILLEGAL ARREST AND ILLEGAL SEIZURE OF HIS DENTURES.

## SENTENCING PHASE ISSUES

**XVI. THE USE OF EDDIE HOWARD'S PRIOR CONVICTIONS TO ESTABLISH THE "PRIOR VIOLENT FELONY" AGGRAVATOR WAS IMPROPER, FOR ASSAULT WITH INTENT TO RAVISH IS NOT PER SE A CRIME INVOLVING THE USE OR THREAT OF VIOLENCE.**

**XVII. THE SPECIAL RELIABILITY REQUIREMENTS THAT ATTEND THE USE OF THE DEATH PENALTY OBLIGATED THE COURT TO CHARGE STANDBY COUNSEL WITH THE DUTY TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE.**

¶3. As we deem issues I, X, and XIV to be dispositive of the case and to require reversal, we do not endeavor to discuss the other issues raised by the appellant.

## STATEMENT OF THE FACTS

¶**4.** Georgia Kemp, age eighty-two, was a resident of Columbus, Mississippi. On February 2, 1992, after a neighbor observed smoke coming from the Kemp residence, the Columbus Fire Department arrived at the home and discovered the front door standing open. The firefighters entered and found a smoldering fire in the living room which had burned two holes in the floor of the home. Upon extinguishing the fire, they discovered a partially burnt broom in one of the holes. The firefighters found Ms. Kemp's body on the bedroom floor, lying on her left side near the bed. They also found a butcher knife with blood on it lying on the bed. The phone was off of the receiver and the phone line had been cut.

¶5. Investigators found nylon stockings around the ankles of the victim, and two stab wounds to the chest. An autopsy revealed extensive bruising on Georgia Kemp's face and neck, and that bleeding occurred under the scalp. Testimony suggested that the bruises on Ms. Kemp's body were consistent with an attempt to choke the victim and a struggle with her assailant. The stab wounds were determined to be the cause of death. The autopsy also revealed bruises and scrapes to the skin of the vaginal vault, injuries said to be "consistent with forced sexual intercourse." Bite marks were found on the victim's right breast, and also between her neck and shoulder and the back of her right arm.

¶6. On February 6, 1992, apparently without a warrant, the Columbus police detained Eddie Lee Howard and took him to a dentist's office, where he was forced to allow impressions to be made of his mouth. The police retained these impressions, and also took from Howard a partial denture. Following comparisons by investigators of the impressions made of Howard's teeth to bite marks on the victim's body, the defendant was arrested on February 8, 1992, for the murder of Ms. Kemp.

¶7. While in jail, Howard refused to sign a form waiving his *Miranda* rights. Testimony suggested, however, that Howard later asked an investigator to carry him to the crime scene to see if it might bring something back to his memory. Testimony from the investigator further suggested that, after returning to the jail, Howard commented to him that "the case was solved; that I had the man," and that Howard also said that he "had a temper and that's why this happened." Howard purportedly also told the investigator that others were involved and that he should continue investigating.

¶8. Howard was initially represented by Richard Burdine. In February 1993, Burdine was replaced by Douglas Stone. Stone served as Howard's counsel until five weeks prior to the trial, which ensued on May 9, 1994. During the period of representation by both Burdine and Stone, few motions were filed. Though one trial date drew so close that Stone received a continuance only on the eve of the trial, no motion to test the admissibility of the State's dental impression evidence or the alleged confessionary comments were ever filed by either of Howard's attorneys. Though the only evidence which linked the defendant to the crime scene itself were the dental impressions, neither Burdine nor Stone made a serious effort to obtain funds for an expert to investigate the reliability of the bite-mark comparison or to counter the testimony of the State's dental expert. Nearly two and one-half years after his arrest, Howard appeared before the trial judge and requested that he receive his speedy trial and that the judge not grant his attorneys any more continuances. The judge responded that the defendant would have to cooperate with his attorneys and accept their judgment as to the timing of the trial, and noted that Howard had "an absolute right" to represent himself if he could not cooperate with his attorneys.

¶9. Howard at that point determined that he wished to carry out his own defense. The trial judge appointed Thomas Kesler and Armstrong Walters to serve as standby counsel at the trial and to assist Howard with procedural matters. Howard never filed any pretrial motions in the case, and proceeded to trial on May 9, 1994. During *voir dire*, Howard exercised no peremptory challenges, nor any challenges for cause. He did, however, object to the removal of several potential jurors after the prosecutor offered to protect Howard's interest through challenging the jurors for cause. These panel members included the wife of a Columbus policeman who had discussed the case with her husband and admitted that she could not be impartial, a female who was previously a rape victim, and the father-in-law of the officer who carried out the criminal investigation which led to the murder charge against Howard. This juror, William Coleman, eventually would become the foreperson of the jury.

¶10. When the trial began, Howard made no opening statement. The State's case relied heavily upon the testimony of a dentist, Dr. Michael West, who testified that he matched one of the bite marks to the impressions of Howard's teeth. The State presented no blood, semen, or other evidence to prove that Howard had committed rape, but relied upon circumstantial evidence of bruises and bites upon the victim. Despite the opportunities to test the evidence presented by the prosecution, Howard's questions to the witnesses attempted to elicit information which rarely had any relevance to the trial. For example, Howard questioned the firemen who discovered the victim's body on the subject of the fire department's hiring practices. While apparently hoping to elicit information about an imagined conspiracy so complicated that it never took shape even in his own mind, he questioned a witness as to whether it was unusual for an elderly person such as the victim to have a driver's license.

¶11. The record reveals that Howard's appellate brief is correct in noting that he rarely questioned anyone directly, preferring instead "to propound asides to them, much as in a Shakespearean play." Howard frequently offered such quips as "two wrongs don't make a right . . . the Wright brothers made an airplane." During the trial, the judge noted the incoherent approach of the defense and told Howard that he could see that he was just "leafing through the file . . . calling witnesses whose names appear." At the close of the presentation of evidence, Howard gave a rambling closing statement in which he questioned why the young girl who first reported the smoke coming from the victim's house had not been doing her homework, reiterated his theory that his own family members killed Ms. Kemp and were framing him, and then suggested that one of the jurors might have committed the

crime. Following this display, the jury deliberated for approximately thirty-five minutes before returning a guilty verdict.

¶12. During the sentencing phase, Howard refused to say anything to the jury. He made no opening or closing statement, made no objections, submitted no mitigating evidence, and submitted no jury instructions. When the trial judge asked him if he had anything to say, he responded "I don't have no argument. Shit [sic] planned before I even got to Columbus." After a one-hour sentencing hearing, the jury deliberated for ninety minutes and sentenced Howard to death.

## DISCUSSION OF ISSUES

### I. THE CIRCUIT COURT ERRED IN PERMITTING EDDIE HOWARD TO ACT AS HIS OWN ATTORNEY AT TRIAL.

¶**13.** Five weeks prior to the trial, Howard appeared before the trial judge and requested that the case be tried with no further continuances granted to his attorney. The trial judge told Howard that he had to cooperate with his court-appointed attorney, and then asked if Howard would like to conduct his defense himself. The trial judge informed Howard that he must agree to any delays or acquiesce to the filing of any motions which his attorney felt necessary, or he had the option to represent himself. Contrary to the judge's statements, the right to a speedy trial belongs to the accused rather than to the attorney representing the defendant. *Barker v. Wingo*, 407 U.S. 514 (1972). Faced with the prospect of having to accept further delay before trial, Howard then questioned the judge about proceeding without a lawyer. The trial judge then told Howard that he had an "absolute right" to conduct his own defense.

¶**14.** *Faretta v. California,* 422 U.S. 806 (1975), recognizes that the Sixth Amendment grants each defendant a right to conduct his or her own defense, though the right is not, as the judge told Howard, absolute. The right exists only where the waiver of counsel can be made in a knowing, intelligent, and voluntary manner. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Howard contends that the waiver was not voluntary in that the court incorrectly forced him into the position of choosing between two constitutional rights, the right to speedy trial and the right to counsel, although he was entitled to both. When faced with the judge's implied assertion that he would have to give up the right to speedy trial if his attorney deemed it necessary to delay the matter for any length of time, Howard chose to invoke the right to speedy trial and to forego the right to representation.

¶15. The State argues in response that defendants must choose between constitutional rights at many times, and that error has not occurred when a defendant is placed in such a position. The State has pointed to the choice which a defendant must make between invoking the right to counsel and exercising the right to represent oneself as a choice which necessarily sacrifices one right in order to utilize another, and argues that such choices are made in each criminal case. Unlike the right to counsel and the right to represent oneself, however, the constitutional right to counsel and to receive a speedy trial are not components of an "either/or" guarantee. Unlike the obvious sacrifice of one right presented by the need to choose between the right to counsel and the right to conduct one's own defense, criminal defendants have never been required to orchestrate their own defense in order to invoke the right to a speedy determination of guilt or innocence.

¶16. The right to a speedy trial is held by the defendant, not his defense attorney, and recognition of

that right by the trial court could have allowed Howard to retain both rights. The judge's ruling may well have placed Howard in the position of choosing between representation by counsel and enduring as many delays as his attorney deemed necessary. Therefore, we hold in this case that the decision to waive the right to counsel was not made in the voluntary manner contemplated by the Sixth Amendment.

¶17. Howard further argues that his waiver of the right to counsel was not knowing or intelligent, for it should have been readily apparent to the trial judge that Howard was not competent even to assist in his defense, much less conduct his own defense. Prior to Howard's assumption of the *pro se* defense of his case, his court-appointed attorneys never formally moved the court for a competency hearing. The State argues that, as none of Howard's defense counsel requested a hearing on Howard's competency, the issue is barred from consideration. The State further argues that this Court has held that the burden to go forward with evidence to show a defendant's probable incapacity to make a rational defense lies with the defense, citing **Emanuel v. State**, 412 So. 2d 1187, 1188 (Miss. 1982), and **Dusky v. United States**, 362 U.S. 402 (1960). The State maintains throughout that there was no evidence before the court that would cause the trial judge to suspect Howard of having a substantial mental disability, and that it would thus be unreasonable for this Court to hold that the trial judge should *sua sponte* have ordered a competency hearing or further questioned whether Howard was capable of conducting his own defense.

¶18. This Court has addressed the issue of the trial court's obligation in this area, and noted that "[e]ven where the issue of competency to stand trial has not been raised by defense counsel, the trial judge has an ongoing responsibility to prevent the trial of an accused unable to assist in his own defense." **Conner v. State**, 632 So. 2d 1239, 1248 (Miss. 1993). The test for competency to stand trial is certainly a standard which must be met before a defendant can be said to be capable of intelligently and knowingly waiving the right to counsel. **Id**.; see also **Pate v. Robinson**, 383 U.S. 375, 384 (1966). The test for competency to stand trial mandates that a defendant be one "(1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity and complexity of the case."[1] **Conner**, at 1248 (footnote omitted).

¶19. Rule 4.08(1) of the Uniform Criminal Rules of Circuit Court Practice provides:

> Inability to Stand Trial. If before or during trial the court, of its own motion or upon motion of counsel, has reasonable grounds to believe that the defendant is insane, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with Miss. Code Ann. § 99-13-11 (1972).

¶20. This provision makes clear the trial court's obligation to order a competency hearing under certain circumstances. As this Court said in **Conner**, "the real question, therefore, is whether 'reasonable grounds' existed to believe that [the accused] was insane. If so, then Rule 4.08 mandates a competency hearing. The determination of what is 'reasonable,' of course, rests largely within the discretion of the trial judge. He sees the evidence first hand; he observes the demeanor and behavior of the defendant." **Id**. at 1248.

¶21. For purposes of reviewing a decision to forego a competency hearing, this Court has cited the

test applied by the Fifth Circuit Court of Appeals: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competence and alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense?" *Conner* at 1248, citing *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).

¶22. In *Conner*, just as in the case at bar, no competency hearing was ever held even though Conner was ordered to undergo an evaluation at the state mental hospital. As a result of that court-ordered mental evaluation, the trial judge in *Conner* had at his disposal a report which stated that "while he has been here, he has been under close observation and has had medical and psychological workup." *Id*. at 1251. The report went on to say that Conner was competent to stand trial, for though he was diagnosed as schizophrenic, "he is on medication and this could account for his lack of symptoms." *Id*. This Court ruled in *Conner* that the trial court did not err in failing to order a competency hearing *sua sponte*, as the trial judge had the benefit of the psychiatrist's report as well as the benefit of observing the defendants demeanor at trial. *Id*.

¶23. Just as in *Conner*, the trial judge in the case at bar never ordered a competency hearing, but did order a mental evaluation at the state mental hospital. Apparently, Howard's attorney never informed him that he would be questioned or otherwise taken for an evaluation with which he should cooperate, and when Howard reached the hospital, he refused to answer questions. He then asked to call his attorney, whom he was unable to reach for one reason or another, and the interview with Howard was never completed. The results of the attempted evaluation, as the interviewing physician's report demonstrates, were as follows: "Provisional Diagnosis: Because of his lack of cooperation, we have not been able to assign to Mr. Howard even a provisional diagnosis." Though the interview apparently never went forward, and the doctor was reluctant to make "even a provisional diagnosis," the physician's report miraculously continued on and concluded that

> Mr. Howard appears to have the sufficient mental ability to consult with an attorney with a reasonable degree of rational understanding. . . . Mr. Howard was not suffering from any major mental disorder at the time of the alleged offenses such that he would not have known the nature and quality of his actions or would not have known that those alleged actions were wrong.

¶24. Howard's attorney at the time, Richard Burdine, moved again for a psychological evaluation, but the motion was never brought forward on the court docket. Neither was any further mention made by Howard's attorney of the inadequacy of the prior evaluation or the need to further evaluate the defendant. As a result, the trial judge never had access to a complete evaluation of the defendant's mental capacity as did the trial judge in *Conner*.

¶25. This Court has held that a competency hearing is mandated whenever a reasonable question of the defendant's capacity arises. *Conner* at 1248; see also *Pate v. Robinson*, 383 U.S. 375 (1966). This Court has also said that the defendant's court-appointed counsel is in the best position to know whether or not the defendant is mentally capable of executing a knowledgeable waiver of counsel. *Metcalf v. State*, 629 So. 2d 558, 563 (Miss. 1993). In the case at bar, Howard's attorneys attempted numerous times to explain to the judge the depth of the problem they had in communicating with the client, in gaining his trust, and in understanding Howard's notion of reality.

¶26. In the motion for a psychiatric examination filed by attorney Burdine in 1992, counsel observed that the defendant "is unable to intelligently communicate with his attorney or anyone else, and it is the attorney's impression that the defendant's present mental condition is such that he is unable to cooperate and aid in the preparation of his defense and further, that the defendant has spent time in a mental hospital in the past." In February of 1993, attorney Douglas Stone filed an affidavit with the trial court stating that "I have attempted to confer with the defendant, Eddie Lee Howard, and have trouble communicating with him. I feel the defendant, Eddie Lee Howard, is unable to prepare his defense in this cause due to a mental condition." Finally, after observing the defendant during the first phases of the trial, Howard's court-appointed standby attorneys urged the court to reconsider the question of Howard's competency to represent himself and asked that the court order that he undergo psychiatric evaluation. One of the attorneys, Armstrong Walters, stated:

> Judge, I'm not sure he's capable of assisting in his own defense much less carrying his own defense out. . . . I do not feel that this defendant is in touch with reality. . . . of all the criminal defendants that I've ever defended and I've been a public defender in this county for two years . . . this defendant is more out of touch with reality than any defendant that I have ever defended or seen in this county.

¶27. In the case at bar, just as in *Conner*, the trial judge had the opportunity to observe Howard's demeanor before and during the trial. This Court has previously pointed out that the trial court is in a better position to evaluate the demeanor of a defendant than this Court. *Conner v. State*, 632 So. 2d 1239, 1248. Though this is true, trial courts are not be fully insulated from review of the continuing duty to order a competency hearing by the mere fact of the judge's proximity to the defendant. "While [a defendant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Pate v. Robinson*, 383 U.S. 375, 385 (1966). Where facts appear on the record which, when objectively considered, reasonably raise the question of a defendant's competence to stand trial or to continue to represent himself, the trial court is obligated by Rule 4.08 to order a competency hearing.

¶28. In the present case, and unlike *Conner*, the defendant was not medicated in order to control symptoms of any psychological condition. The record reveals that Howard frequently exhibited behavior which reasonably should have raised a question as to his ability to represent himself and a question of his competency to stand trial. Examples which might objectively prompt anyone to question the decision to allow a defendant to continue *pro se* include the fact that he insisted upon receiving a speedy trial rather than await the outcome of motions filed by his attorney because any further delay was a part of the "conspiracy," as well as the fact that he suggested that his own family was behind the murder and was attempting to frame him.

¶29. Also, at a March 1994 hearing, Howard told the judge that "they" were trying to kill his mother. At trial, Howard apparently rarely asked rational questions, if he asked questions at all. He repeatedly referred to himself in the third person, and would engage in rambling commentary with little or no apparent relationship to the trial. This included comments made when questioning a young witness who had observed the fire at the victim's home, an observation which led to the discovery of the murder. Howard asked the witness if she knew the victim, and after the witness responded that she was not familiar with Ms. Kemp, Howard said "Sometime you have to kind of initiate, you know, trying to be friendly, trying to be helpful; you can't just wait on somebody to come to you. That's why

the world is like it is today because everybody waiting on the next person . . . ." This and other strange comments were ended only by interruption of the judge, who himself noted midway through the trial that Howard was only "leafing through the file" and randomly calling witnesses. The record reveals that Howard's effort was at best incoherent and deluded. During his closing argument, Howard repeatedly referred to the conspiracy theme and to his theory that his immediate relatives committed the murder and were framing him. He then argued to the jury that one of the jurors might have committed the crime. At the close of the sentencing phase, when asked if he would address the jury, Howard simply replied that the outcome was "decided before I ever got to Columbus."

¶30. Howard's demeanor before and during the trial thus included numerous instances of paranoid behavior. Coupled with the fact that all four attorneys who attempted to represent Howard suggested to the court that the defendant was not competent even to assist his own defense, the trial judge "received information which, objectively considered, should have raised a doubt about the defendant's competence and alerted him to the possibility that the defendant could neither understand nor appreciate their significance, nor rationally aid his attorney in his defense," and that a competency hearing was thus mandated by Rule 4.08.

¶31. Further, this State requires that trial courts make a case-by-case determination of a defendant's assertion of the right to proceed *pro se*. **Metcalf v. State**, 629 So. 2d 558 (Miss. 1993). All four of Howard's attorneys informed the court that Howard was unable to understand the full meaning of his waiver of the right to counsel, and their doubts as to his understanding of the criminal process. The trial court seemingly never made a determination on the record that the waiver was intelligent and voluntary, but rather informed the defendant that he had the "absolute right" to defend himself if he wished. The trial judge then simply ruled that "this court is going to actually hold and will allow Mr. Howard to proceed in this matter *pro se* . . . ."

¶32. Eddie Lee Howard was obviously unaware of the importance of retaining trial counsel or of trial preparation, as he insisted that he was not incompetent and was only the victim of a conspiracy. The State admits that Howard's only theory of defense was that he was framed by his own family, and also that he felt that he could not trust his own lawyers because they were hired by his family members. Faced with this peculiar situation, the trial court did not order a competency hearing or reconsider the Constitutional validity of Howard's waiver of counsel, but rather chose to engage in discussions with Howard which are typified by the following colloquy:

> Q. You're aware that, of course, one of the things that is normally done at this point is that the defendant in a capital case goes and has a mental examination, isn't that right, Mr. Howard?
>
> A. Sir, I shouldn't even be in this jail, period. I shouldn't even be in this situation. I don't know what ya'll --is--if I'm crazy--if I'm crazy, a whole lot more peoples out there need to be locked up.
>
> Q. Mr. Howard, are you aware or are you not that it is standard operating procedure and it is customary for litigants in capital litigation to go get a mental examination?
>
> A. Dat's (sic) the whole--dat's (sic) what's the whole point of me being placed in this situation. See, dis (sic) thing was pre-planned; like I say, it wasn't nothing but a conspiracy. All this going here, going there; it was a time factor involved. I had to sit in jail two years and three months

before I had a trial. All that was planted.

Q. Mr Howard, are you aware or--

A. Two hundred and seventy days was the time limit by rule of law that I should have been given a fair and speedy trial.

Q. Mr. Howard--

A. Why wasn't I given a trial in two hundred and seventy days?

Q. Mr. Howard, are you aware or are you not that it is standard operating procedure--

A. I'm aware that--

Q. --for capital litigants--

A. --this is a conspiracy; that's what I'm aware of.

Q. Do you know that they customarily seek mental exams to obtain mitigating evidence to assist--

A. Yes, especially when you've been framed up--

Q. Their clients in the sentencing phase?

A. --in a situation whereas all that is required. Yes, I'm aware that it was required by this conspiracy plan.

¶33. The language in *Metcalf v. State,* 629 So. 2d 558 (Miss. 1993), that defense counsel is in the best position to determine if the defendant has executed a knowledgeable waiver of counsel, is particularly applicable to this case. Each and every one of the four attorneys who found themselves dealing with Howard told the court in some form or fashion that Howard could not assist them in his defense, much less carry out his own defense. The court below could not have known whether Howard was capable of knowingly and intelligently waiving the right to counsel, as a competency hearing should have been ordered before or during the proceedings. The failure to do so, under these circumstances, constitutes error.

**GUILT PHASE**

**X. THE LOWER COURT VIOLATED THE DEFENDANT'S RIGHT TO COUNSEL WHEN IT REFUSED HIS REQUEST THAT HIS STAND BY (sic) COUNSEL BE ALLOWED TO GIVE THE DEFENSE'S CLOSING ARGUMENT AT THE GUILT/ INNOCENCE PHASE.**

¶34. After all of the evidence had been presented and both sides rested their respective cases, the trial judge noted that Howard had not submitted any jury instructions. The trial judge then directed that "Howard's standby counsel consult with Howard" and prepare the instructions. As they did so, Howard requested that counselors Thomas Kesler and Armstrong Walters take "an active role." He requested that they present the closing arguments before the jury on his behalf, and they in turn

agreed to convey that request to the trial judge. Howard contends that the trial court refused the request, which refusal was an abuse of discretion and a violation of his right to counsel.

¶35. In response, the State argues that Howard never directly requested that counsel be allowed to make the closing argument, and that as the defendant's "standby counsel" never conveyed any desire to make the closing argument, the trial court never actually refused to allow Kesler or Walters to make final arguments to the jury.

¶36. In a post-trial hearing to reconstruct the events, attorney Kesler testified as follows:

> . . . at the time Mr. Howard, the defendant, told me that the time had come for us to take an active role, that he wanted us to argue his case. That's not a direct quote, but that's what he conveyed. I was not in favor of doing that. I told Mr. Howard, the defendant, that, and then I told him that I would convey what was going on to the trial judge, Judge Howard. I walked down the hall, asked if I could be admitted to see Judge Howard; I was. I told him that Eddie Lee Howard had-- the defendant, Eddie Lee Howard, had stated that he wanted us to now argue this case to the jury for him. I told Judge Howard that I did not want to be put in that position because number one, it had just been sprung on us. Uh, we had been sitting on the rail not actively taking any participation in the trial. As a matter of fact, I don't recall that he had-- that the defendant, Eddie Lee Howard, had asked us to do anything during the trial at all, and I didn't think that it was fair for us to be thrust into that with no time to prepare any closing arguments and not having prepared. I told Judge Howard, however, that if he ordered us to do so that obviously we would make an attempt to make the closing argument as best we could under the circumstances. Judge Howard, uh, didn't-- of course, didn't rule; this was in chambers. He indicated that he would not require us to do that. I returned down to the public defenders office; I told you [Mr. Walters] and the defendant, Eddie Lee Howard, that I did not believe that the judge was going to require us to make the closing argument. Then we went back into the courtroom... At no time did I personally say--tell--go to Judge Howard and say, "I, Tom Kesler, and Armstrong Walters want to make the closing argument. . . ."

The trial judge also made an on-the-record statement of his recollection of the events.

> At no time did this Court feel that it was asked by defense counsel or standby counsel, Mr. Kesler or Mr. Walters, that they be allowed to give a closing argument and at no time did I refuse to allow them to do so. They came to me or Mr. Kesler came to me with the understanding that Mr. Howard might request that they give the closing argument and that the defense counsel did not wish to do that because they were unprepared, as well they would be, and I told them that I would not order them to do it and the trial proceeded.

¶37. The record clearly reflects that Howard understood that the counsel appointed to him would convey the request to the judge, that Kesler did convey to the trial judge the defendant's wish, and that the trial judge ruled that such participation could not be allowed. After speaking in chambers with Mr. Kesler, the trial judge returned to the courtroom and told the defendant, "I have directed that they prepare jury instructions so that they might be presented to the Court and ruled on properly, but they cannot participate at this late stage in the argument of this case."

¶38. The role of counsel appointed to assist Howard in carrying out his own defense includes, among

other things, the necessity of preparing as adequately as possible to assume a more active role in the trial, should the need arise. It is apparent that, for whatever reason, Howard utilized counsel very little before attempting to have them present the final argument on his behalf. Howard did, however, apparently understand that they were present to act as his counsel and as his advocates at all times, and that the trial court had encouraged him to trust them and to rely upon them. In an ironic twist, when Howard finally attempted to rely upon court-appointed counsel to convey his wishes to the trial judge, Kesler went into the judge's chambers and successfully argued that Howard's request to have standby counsel present the final arguments should not be granted. From the foregoing, it is apparent that the trial judge understood that Howard wished for counsel to make the closing argument, but that both Howard's appointed attorneys and the trial judge were more concerned with the prospect of the presentation of a somewhat impromptu closing argument than with guarding the defendant's right to counsel.

¶39. Howard cites *Dowell v. State,* 557 N.E. 2d 1063 (Ind. App. 1990), and argues that it was an abuse of discretion to refuse to allow standby counsel to conduct closing arguments. In *Dowell*, the Indiana Court found that it was an abuse of discretion for a trial judge to summarily deny a *pro se* defendant's request that court-appointed counsel be allowed to make closing arguments. The case was remanded with instructions to consider the following factors in such a situation:

> 1. Whether the defendant made his request prior to the closing argument;
>
> 2. Whether it was the first time the defendant stated that he wanted to change from self representation to representation by an attorney;
>
> 3. Whether the defendant's performance prior to this stage of the trial had been less than effective.
>
> 4. Whether the defendant had standby counsel who had been present throughout the trial and who was prepared to assume representation without delay.

*Id*. at 1067-68.

¶40. The State responds that the principal distinguishing factor between the situation encountered in *Dowell* and the case at bar is that "counsel [Kesler] specifically requested that the trial judge *not* require them to make the closing statements." The State's argument ignores the fact that the right to counsel belongs to the criminal defendant, not to counsel appointed to assist the *pro se* defendant.

¶41. The right to counsel is so fundamental that "courts should indulge every reasonable presumption against waiver." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). In balancing the alternatives of granting or denying Howard's request, it would have required little effort for someone already ordered to serve as standby counsel to make some sort of argument, while granting the request would have done a great deal to protect the Howard's right to counsel.

¶42. The Constitution of the State of Mississippi contains the following provision: "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . ." Art. 3, § 26, Mississippi Constitution (emphasis added). In addition to the import of this provision, this Court has gone so far as to sanction a form of hybrid representation in which standby counsel have been

allowed to present closing argument, or defendants who have not elected to proceed *pro se* are nevertheless allowed to address the jury. See, *Gray v. State*, 351 So. 2d 1342 (Miss. 1977); *Young v. State*, 425 So. 2d 1022 (Miss. 1983).

¶43. Given Howard's poor performance, the trial judge should not have summarily ruled that Howard's attorneys could not argue at that stage of the case. This Court has held in the past that it is certainly within the trial judge's discretion to allow both the defendant and his counsel to address the jury at such a point in the trial. *Young v. State*, 425 So. 2d 1022, 1026 (Miss. 1983). Allowing Howard's attorneys, or both Howard and his attorneys, to have addressed the jury would have safeguarded the defendant's right to counsel with no concomitant drawbacks. Under the circumstances, it was an abuse of discretion to refuse to grant Howard's request to have counsel address the jury.

¶44. The proceedings in the lower court and the foregoing discussion highlight the minefield of possible errors created for a trial judge when the right to counsel is waived. Likewise, the role of appointed counsel often becomes blurred when counsel is requested to remain and assist the defendant who wishes to carry out his own defense. However, if each party will zealously fulfill their role, we can ensure that the trial courts are not placed in such an unenviable position in terms of the number of errors or potential errors, while at the same time honor the right to counsel and ensure confidence in the reliability, fairness, and outcome of such trials.

¶45. Often, a defendant who has elected to proceed *pro se* needs assistance with procedural matters such as drafting appropriate jury instructions. Also, the Constitution of the State of Mississippi holds the right to counsel in high regard, as it guarantees the right to be heard *prose*, through counsel, or both. Throughout American criminal jurisprudence is the admonishment that courts should point out the right to counsel at each critical stage of a criminal proceeding.

¶46. The decision to provide counsel to a defendant who has elected to proceed with his own defense has been addressed by the United States Supreme Court. In a footnote in *Faretta v. California*, 422 U.S. 806, 834 n. 46 (1975), the Court acknowledged that "where the defendant waives counsel and chooses to exercise his *Faretta* right of self-representation, the trial judge "may -- even over the objection by the accused -- appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused, in the event that termination of the defendant's self-representation is necessary."

¶47. The termination of the defendant's *pro se* representation mentioned in the *Faretta* footnote may be necessary if the defendant in some way abuses the right and disrupts the courtroom. In cases in which no counsel has been made available to step in and assume the defense, the trial court is hamstrung between the choice of delaying the trial and allowing the defendant to continue to control the courtroom. The mechanism of providing trial counsel to a *pro se* defendant in order to avoid delay and difficulty is clearly permissible under the Sixth Amendment if counsel will adhere to the standards established in *McCaskle v. Wiggins*, 465 U.S. 168 (1984). In *McCaskle*, the Supreme Court of the United States took the opportunity to exhaustively expand on the *Faretta* footnote. *McCaskle* establishes that participation by court-appointed counsel for the purpose of steering the defendant through the basic procedures of a trial is permissible even in "the unlikely event" that it somewhat undermines the defendant's appearance of control over his own defense. *McCaskle* at 184.

*McCaskle* further establishes that court-appointed counsel may legitimately play a role in a *pro se* defendant's case, even over the objection of the defendant, if the defendant is "allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id*. at 174. Should any *pro se* defendant claim that his right to self-representation was infringed upon by the unwanted assistance of court-appointed counsel, the primary inquiry is into "whether the defendant had a fair chance to present his case in his own way." *Id*. at 177. The *McCaskle* Court established that the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. Where court-appointed counsel's participation over the defendant's objection effectively allows counsel to make, or substantially interfere with, any significant tactical decisions, or to control the questioning of witnesses, or to speak for the defendant on any matter of importance, the right to self-representation is eroded. *Id*. at 178. As the United States Supreme Court noted, "actual control over the case . . . is the core of the *Faretta* right." *Id*.

¶48. The Supreme Court also announced that any participation by counsel without the *prose* defendant's consent must not be allowed to destroy the jury's perception that the defendant is representing himself. *Id*. The *Faretta* right is not trampled if "disagreements between counsel and defendant are resolved in the defendant's favor whenever the matter is one which would normally be left to the discretion of counsel." *Id*. at 179. Finally, the *McCaskle* Court established that once the *pro se* defendant invites or agrees to participation by counsel, any subsequent appearances by counsel must be presumed to be within the defendant's acquiescence, at least until the point that the defendant expressly and unambiguously renews his request that counsel be silenced. *Id*. at 183.

¶49. If the courts of this State will honor the right to counsel in this manner, and those in the role of counsel to a *pro se* defendant will stay within the strictures of *McCaskle*, this Court should see fewer such assignments of error in the future. Under the bizarre circumstances of this case, we hold that assigned error number X has merit which requires reversal and remand for a new trial.

### XIV. TESTIMONY FROM THE STATE'S DENTAL EXPERT, MICHAEL WEST, CLAIMING TO HAVE POSITIVELY MATCHED EDDIE HOWARD'S TEETH TO A BITEMARK ON THE VICTIM'S BODY WAS CONSTITUTIONALLY UNRELIABLE, AS IT IS WELL-ESTABLISHED IN THE SCIENTIFIC COMMUNITY THAT SUCH COMPARISONS ARE NOT POSSIBLE.

¶50. The State's case against Howard included testimony by Dr. Michael West, a dentist, that one of the bite marks found on the victim was a "positive match" to Eddie Howard's teeth. Dr. West testified that the science of dentistry recognized that teeth are unique, and that bite marks can "be identified back to the perpetrator or biter." Dr. West also stated that bite-mark evidence is similar to fingerprint identification. The defendant never objected to the qualification of Dr. West in this area, nor did he object during the direct examination of the witness. Only during re-direct did Howard stand and exclaim that the witness was engaging in "hocus-pocus stuff."

¶51. The defendant now argues that bite-mark comparison evidence is "constitutionally unreliable," in that the techniques of bite-mark comparison have not reached the point of such general acceptance in the scientific community that such expert testimony should be the basis of a criminal conviction. The State asserts that this issue is procedurally barred because the defendant made no objection of any

kind until re-direct of Dr. West, and only then stood and made critical but very general comments about the testimony. The State urges, should we find that the issue is not procedurally barred, that this Court then directly address the admissibility of bite-mark evidence and find that this science is reliable and sufficiently established that experts in this area are not required to prove in each individual case that the methods of bite-mark comparison have gained general acceptance in the scientific community.

¶52. The general objection of the *pro se* defendant was adequate to preserve review of this issue. This Court has never ruled directly on the admissibility or reliability of bite-mark identification evidence, though it has addressed cases in which bite-mark evidence was an issue. See, *i.e.*, **Harrison v. State**, 635 So. 2d 894 (Miss. 1994) (failure to provide funds to criminal defendant for expert odontologist was violation of due process where only evidence against defendant came from testimony of State's expert). While few courts have refused to allow some form of bite-mark comparison evidence, numerous scholarly authorities have criticized the reliability of this method of identifying a suspect. **State v. Ortiz**, 502 A.2d 400, 403 (Conn. 1985). It is much easier to exclude a suspect through such comparison than to positively identify a suspect. **Spence v. Texas**, 795 S.W.2d 743, 750-51 (Ct.Crim.App.Tex. 1990); **People v. Milone**, 356 N.E.2d 1350, 1356 (Ill. 1976).

¶53. There is little consensus in the scientific community on the number of points which must match before any positive identification can be announced. **Spence** at 750-51. Because the opinions concerning the methods of comparison employed in a particular case may differ, it is certainly open to defense counsel to attack the qualifications of the expert, the methods and data used to compare the bite marks to persons other than the defendant, and the factual and logical bases of the expert's opinions. Also, where such expert testimony is allowed by the trial court, it should be open to the defendant to present evidence challenging the reliability of the field of bite-mark comparisons. **State v. Ortiz**, 502 A.2d 400, 403 (Conn. 1985). Only then will the jury be able to give the proper weight, if any, to this evidence.

## CONCLUSION

¶54. We point out that in our consideration of these matters, we do not sit as a second trial court. The appellate court is not an institution created to second guess the verdict of jurors, but to ensure that the dictates of due process are followed. Were this Court to employ any other criteria, the people could not be confident that the procedures employed by our courts in this or in any future case would be sufficient to allow an accurate determination of guilt or innocence. As we are not convinced that due process could escape intact were we to countenance the occurrences in the instant case, we are left no alternative except to reverse the verdict of the jury and remand the matter to the lower court for a new trial or other disposition.

¶55. **REVERSED AND REMANDED TO THE TRIAL COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**SULLIVAN, P.J., PITTMAN, BANKS AND McRAE, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. PRATHER, P.J., NOT PARTICIPATING.**

**SMITH, JUSTICE, DISSENTING:**

¶56. The majority reverses Howard's conviction for capital murder and sentence of death imposed by a Lowndes County jury on the basis of several supposed errors committed by the trial judge: (1) allowing Howard to represent himself; (2) refusing Howard's request to allow standby counsel to make his closing argument. The majority also avoids the bite mark evidence issue which is certain to arise again on re-trial. The case *sub judice* is the appropriate case for this Court to rule that bite mark evidence is admissible. I disagree with the majority on all issues and accordingly dissent.

**I**

¶57. First, the majority writes that the trial judge informed Howard that he had to cooperate with his court-appointed attorney and must accede to any delays or acquiesce to the filing of any motions which his attorney felt necessary, or he had the option to represent himself. The trial judge advised Howard that he had an absolute right to conduct his own defense. The trial judge was correct if it can be demonstrated that the waiver of counsel was made in a knowing, intelligent, and voluntary manner. *Johnson v. Zerbst*, 304 U.S. 458 (1938). Howard claims, and the majority agrees, that the trial court forced him into choosing between two constitutional rights. The majority also holds that it should have been apparent to the trial judge that Howard was incompetent to represent himself, and that the trial court had an ongoing responsibility to prevent the trial of an accused unable to assist in his own defense. *Conner v. State*, 632 So. 2d 1239, 1248 (Miss. 1993), *cert denied*. 513 U.S. 927 (1994).

¶58. In spite of this Court's precedent that "the trial court is in a better position to evaluate the demeanor of a defendant than this Court," the majority, nevertheless proceeds to declare that Howard was incompetent. *Conner* at 1239, 1248. The view expressed by this writer is precisely the view of Chief Justice Burger in his dissent in *Faretta v. California*, 422 U.S. 806 (1975), where the Supreme Court held that the defendant has a Sixth Amendment right to conduct his or her own defense. I adhere to the rule espoused in *Conner*.

¶59. Contrary to the view of the majority, the trial judge was not the first to suggest the idea of self-representation by Howard. On March 29, 1994, attorney Kesler filed a motion to allow Howard to call motions pro se and several other death penalty motions which are rather standard in such cases. Howard objected to all of the motions except the motion to allow Kesler to withdraw as counsel. During an April 5, 1994 hearing on these matters, it was defense counsel Kesler, not the trial judge, who first suggested the hybrid standby counsel similar to that allowed in *Metcalf v. State*, 629 So. 2d 558 (Miss. 1993).

¶60. The trial judge recognized that if he allowed such a procedure, as suggested by the defense in this case, he was placing the trial court in a dilemma, i.e., Howard demanding a speedy trial with no more delays or continuances on the one hand and defense counsel correctly insisting on expert witness assistance to defend against the State's expert testimony on the other hand.

¶61. The majority faults trial counsel for the delays and continuance requests, however, here there

can be no doubt that defense counsel was correct to insist upon expert witnesses for support of the defense. Defense counsel Kesler pointed out to the trial court one of the primary disagreements between counsel and Howard which surfaced during discovery. The State's discovery revealed that Dr. Michael West, a forensic odonatologist, would testify as to bite mark evidence in this case. Kesler, with extensive experience both as a prosecutor and defense counsel in death penalty cases, concluded that an expert in rebuttal was needed by the defense. He requested delays to secure Dr. Thomas Krausse, a Kansas forensic odonatologist, as his expert witness. Howard, in refusing to recognize such necessity, was in fact merely being uncooperative with his attorneys and an obstructionist in his trial proceedings, all to his own detriment. In the case *sub judice,* the trial judge indeed was faced with a catch-22 situation in deciding this issue.

¶62. In my view, this case is analogous to **Matthews v. State**, 394 So. 2d 304, 311 (Miss. 1981), where this Court stated:

> An accused could place the trial judge in a difficult situatio n by insisting on a pro se trial, and, upon conviction, claim that he/she did not have the benefit of counsel and did not knowingly waive counsel. Again, if the court refused to permit an accused to represent himself/herself, and required him/her to have counsel present the case, the accused could contend that he was denied his/her constitutional right in not being permitted to present his/her defense pro se. In such delicate situations, the question of counsel waiver must be determined on the facts of each case. In the case *sub judice*, the attorneys appointed for the appellants were required to remain in the courtroom within a few feet of the appellants during the four days of trial and were present, ready, willing and able to advise, counsel and assist the appellants. In fact, Matthews did call upon her appointed attorney at times for advice. We are of the opinion that the trial judge, who observed and talked with Matthews prior to trial and for four days during the trial, was in the best position to know whether or not she executed a knowledgeable waiver of counsel and was mentally competent to do so, and that he did not err in overruling the motion for a new trial.

In the case *sub judice*, the majority holds that Howard was incompetent and could not understand the consequences of waiving his right to counsel. Contrary to the majority's claim, Howard's primary defense evolved around his view that the jury would not convict him without an eyewitness testimony, a point that he repeatedly emphasized throughout the trial proceedings. As in **Matthews**, stand-by counsel remained in the courtroom to advise Howard as needed. The trial judge even suggested to Howard on several occasions that he should seek advice of his stand-by counsel, a procedure that has been adopted by this Court. **Curlee v. State**, 437 So. 2d 1, 2 (Miss. 1983).

¶63. Also, contrary to the majority's view, the trial judge extensively inquired into Howard's request to proceed pro se. Even though not in effect at that time, the trial judge followed URCCP 8.05 concerning procedures for dealing with pro se defendants. On the very day of trial, the trial judge again inquired of Howard if he desired to proceed pro se. The judge specifically reminded Howard that "I advised you specifically that **I thought it would be in your best interest to have attorneys representing you rather than you represent yourself**." (Emphasis added). Howard, however, continuing to insist upon representing himself, responded, "Yes sir, I do," to the trial court's question about whether he still insisted upon pro se representation.

¶64. And what about the majority's proclaiming that Howard was incompetent? Aside from the complaints by his attorneys that Howard was unable to cooperate and several incidents during trial where Howard exhibited strange behavior, there is little evidence in this record to suggest any mental illness or incompetency. Howard was examined by physicians at the Mississippi State Hospital at Whitfield and their report was filed with the trial court on June 7, 1993. Howard refused to cooperate with the testing, however, the physicians stated that he was alert and appeared to understand their questions. Howard asked to speak to his attorney prior to answering their questions. However, instead of calling his attorney, he spoke only with relatives and friends. Ultimately, Whitfield staff opined: "Based on this very limited examination, he does not presently appear to be experiencing symptoms of any major mental disorder. . . It is our opinion that Mr. Howard appears to have the sufficient present mental ability to consult with an attorney with a reasonable degree of rational understanding and to have a rational as well as factual understanding of the nature and object of the legal proceedings against him. . . Mr. Howard was not suffering from any major mental disorder at the time of the alleged offenses such that he would have known the nature and quality of his actions or would have not known that those alleged actions would be wrong."

¶65. Howard knew right from wrong and was thus not incompetent. Accordingly, Howard made a knowing and voluntary waiver of his right to counsel in order to receive a speedy trial. Howard's attorneys and the trial judge were aware of the Whitfield report, yet neither Howard or defense counsel requested a competency hearing. The burden in this situation lies with the defense. *Emanuel v. State*, 412 So. 2d 1187, 1188 (Miss. 1982), adopting the view of the Supreme Court in *Medina v. California*, 505 U.S. 437(1992), *reh'g denied*, 117 S.Ct. 151 (1996).

¶66. Howard is merely playing both ends of two constitutional rights to the fullest. The factual situation here is nothing short of a knowing and voluntary refusal by Howard to assist counsel, rather than mental inability or incompetence to voluntarily waive counsel and proceed pro se. It is more than noteworthy that the record reflects that anything Howard's defense counsel suggested, Howard was totally against. For example, Howard refused to accept his former counsel's request for an expert to counter the State's expert testimony regarding bite mark evidence. The trial court inquired of Howard: "Then you don't want this expert that your attorney feels so strongly about --. Howard: Your Honor, there's --. The trial court: --knowing that it's. Howard: --absolutely no need for an expert. After two years and two months, if, uh, the defense is not ready it's not going to get ready." This was simply a case of non-cooperation by Howard with defense counsel, an out-and-out refusal to assist his attorney, or any other attorney assigned to him, all of which was clearly indicated by counsel's requests to be allowed to withdraw as Howard's counsel of record.

¶67. The real issue is whether Howard's alleged psychological impairments, which, according to the majority, were readily apparent to all, including the trial judge, presented reasonable grounds to believe that Howard was incompetent, and thus incapable of waiving counsel and standing trial. In *Conner*, supra, this Court stated:

> The real question, therefore, is whether "reasonable grounds" existed to believe Conner was insane. If so, then Rule 4.08 mandates a competency hearing, The determination of what is "reasonable," of course, rests largely within the discretion of the trial judge. He sees the evidence first had; he observes the demeanor and behavior of the defendant.

632 So. 2d at 1248.

¶68. In my view, there is no greater evidence presented here of Howard's alleged mental illness than that produced in *Conner*. Here, the trial judge was not manifestly in error in allowing Howard to represent himself. The majority is merely substituting its' judgment on this issue for the judgment of the trial court. This hybrid type of representation in its many forms is a court-created dilemma and night mare for trial judges, a bottomless pit if you will, with many rabbit trails spiraling off in every direction, which without careful caution and scrutiny by this Court, will allow numerous novel arguments by defendants seeking to prevail, gain reversals of their otherwise valid convictions. I do not favor this hybrid type of assistance by counsel on stand-by. There are no specific guidelines set up by this Court upon which hybrid type stand-by counsel may safely proceed. The procedure is replete with pit-falls for defense counsel, especially court appointed counsel, not to mention a built in, sure fire reversal by this Court. It is time to cut the rabbit trail and do away with this procedure. I would affirm the trial court on this issue.

¶69. Next, the majority concludes that the trial judge erred in refusing Howard's request to allow stand-by counsel to give closing argument at the guilt/innocence phase of the trial. I find the record to be extremely vague regarding this issue. The record reveals:

> By The Court: ...I have heard from your legal advisers that you now wish to not proceed pro se.
>
> By Howard: Uh, that is not quite correct, your Honor. What I told them that As being co-legal advisers they now have the opportunity to present themself (sic) as being co-legal advisers.
>
> By The Court: They are not co-legal advisers.
>
> By The Court: They are legal advisers; they are not co-counsel. You are pro se at your request.
>
> By Howard: Yes, sir. I feel I'm quite capable and able to make the presentation and argument. I just was trying to show them some consideration as being involved in this case matter.
>
> By The Court: I'm sure that they appreciate that, but as a matter of record and as a matter of law **you are your own attorney in this case, and that's the way you want it to be. Is that correct?** (Emphasis added).
>
> By Howard: **That is absolutely correct, your Honor.** (Emphasis added).

The record, although not exactly clear on this issue, nevertheless indicates Howard did not request of the trial judge to allow his stand-by counsel to give closing argument. As he had done on numerous other occasions, when asked by the trial judge if he desired to continue to represent himself, Howard again elected to proceed pro se.

¶70. Examination of the supplemental reconstructed proceedings ordered by this Court concerning this issue, reveals that at the hearing held on July 10, 1995, Kesler testified that Howard asked both stand-by counsel to argue his case, and that he conveyed that message to Judge Howard in chambers. Kesler told the trial judge that stand-by counsel did not wish to be placed in that position because they were not prepared. Kesler stated if ordered to do so counsel would make the argument. Kesler

also testified further that the trial judge did not rule on the request, but did indicate he would not require counsel to make Howard's closing argument.

¶71. Judge Howard's recollection regarding this issue was that stand-by counsel did not ask to be allowed to make the argument and that he did not refuse to allow them to do so. Judge Howard remembered events as follows, "that Mr. Howard might request that they give that closing argument and that the defense counsel did not wish to do that because they were unprepared, as well they would be, and I told them that I would not order them to do it and the trial proceeded."

¶72. Clearly, the defendant Howard, proceeding pro se, never requested of the trial court that stand-by counsel make the closing argument. It was not an abuse of the trial judge's discretion not to order unprepared stand-by counsel to give a summation. I would affirm the trial court on this issue.

## II

¶73. The majority avoids the constitutional reliability question of bite mark evidence, but nevertheless implies that the trial judge erred in allowing the State's expert evidence on bite mark comparisons. Again, I strongly disagree. Howard asked no questions on voir dire of Dr. Michael West when the State tendered him as an expert in the field of forensic odontology, nor did Howard object to Dr. West's testimony. Howard's only comment was that he believed all this to be merely "hocus-pocus stuff," and that Dr. West should "find another profession." Accordingly, Howard has waived this issue and is procedurally barred. *Blue v. State*, 674 So. 2d 1184 (Miss.1996), *cert. denied*. 117 S.Ct. 588 (1996); *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994), *cert. denied*, 115 S. Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995); *Chase v. State*; 645 So. 2d 829, 835, 836 (Miss. 1994), *cert. denied*, 115 S.Ct. 2279 ( 1995), *reh'g denied*, 116 S. Ct. 20 (1995).

¶74. Procedural bar notwithstanding, alternatively considering it on the merits, this issue fails. The majority appears to be merely concerned with this particular expert witness. If so, the majority should simply so state. Instead, the majority ignores the qualifications of Dr. West and the approximate forty cases in six different states wherein he has testified as an expert. The test of an expert is that he "possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman." *May v. State* 524 So. 2d 957, 963 (Miss. 1988). The *May* Court also held that the decision of whether or not an expert witness is qualified to testify is within the sound discretion of the trial court. *Id.* Nor will this Court reverse a trial court's decision absent a showing that this discretion has been abused, or where the witness was clearly not qualified. *Cooper v. State*, 639 So. 2d 1320, 1325 (Miss. 1994).

¶75. The majority fails to address whether such bite mark evidence is even admissible. Instead, the majority leaves an impression that this Court does not favor allowing such evidence. The majority writes that "numerous scholarly authorities have criticized the reliability of this method of identifying a suspect." *Maj.* at 29. The majority also writes "there is little consensus in the scientific community on the number of points which must match before any positive identification can be announced." *Maj.* at 30. This is clearly the minority view nationwide.

¶76. The overwhelming majority of the states have adopted the opposite view. The majority writes, "Also, where such expert testimony is allowed by the trial court, it should be open to the defendant to present evidence challenging the reliability of the field of bite-mark comparisons." While I agree that

a defendant should be allowed to challenge the reliability of bite mark evidence, the majority is mistaken regarding lack of Howard's opportunity to do so in this case. As indicated previously, the record clearly demonstrates that Howard's original counsel insisted on a delay for the employment of such a bite mark expert by the defense, to which apparently the trial judge had also agreed. Howard, however, objected to such an expert.

¶77. Contrary to the majority's implying language otherwise, bite mark evidence has been repeatedly accepted as scientific evidence and held to be admissible. *See **Verdict v. State***, 868 S.W. 2d 443, 447 (Ark. 1993)(bite mark evidence is not novel scientific evidence and was relevant and reliable; ***Handley v. State***, 515 So. 2d 121, 130 (Ala. Cr. App. 1987)(forensic odonatologist testimony admissible as evidence is in the nature of physical comparisons as opposed to scientific tests or experiments); ***State v. Richards***, 804 P. 2d 109, 111 (Ariz. App. 1990)(a ***Frye*** hearing is not required where bite mark evidence is presented by a qualified expert); ***People v. Marsh***, 441 N.W. 2d 33, 36 (Mich. App. 1989)(general reliability of bite-mark evidence as a means of positive identification is sufficiently established that a court is authorized to take judicial notice of reliability without conducting hearing on same); ***State v. Armstrong***, 369 S. E. 2d 870, 877 (W.Va. 1988)( reliability of bite-mark evidence is sufficiently established that a court is authorized to take judicial notice of same) ; ***State v. Stinson***, 397 N.W. 2d 136, 140 (Wis. App. 1986)(bite mark identification evidence presented by an expert witness can be a valuable aid to a jury in understanding and interpreting evidence). *See also,* ***Commonwealth v. Cifizzari***, 492 N.E. 2d 357 (Mass. 1986); ***People v. Shaw***, 664 N.E. 2d 97 (Ill. App. 1996); ***State v. Warness***, 893 P. 2d 665 (Wash. App. 1995); ***State v. Cazes,*** 875 S.W. 2d 253 (Tenn. 1994), *cert denied.* 130 L. Ed. 2d 644 (1995); ***State v. Hodgson***, 512 N.W. 2d 95 (Minn. 1994); ***Mitchell v. State***, 527 So. 2d 179 (Fla. 1988), *cert. denied* 4880 U.S. 960 (1988); ***State v. Ortiz***, 502 A. 2d 400 (Conn. 1985); ***People v. Bethune***, 105 A.D. 2d 262 (N.Y.A.D. 1984); ***Bundy v. State***, 455 So. 2d 330 (Fla. 1984) *cert. denied* , 476 U.S. 1109 (1986 ); ***State v. Green***, 290 S.E. 2d 625 (N.C. 1982); ***State v. Sager***, 600 S.W. 2d 541 (Mo. App. 1980), *cert. denied*, 450 U.S. 910 (1981);***State v. Routh***, 568 P. 2d 704 (Or. App. 1977); ***Niehaus v. State***, 359 N.E. 2d 513 (Ind. 1977), *cert denied* 434 U.S. 902 (1977); ***People v. Marx***, 126 Cal. Rptr. 350 (Cal. App. 1975); ***State v. Adams***, 481 A.2d 718 (R.I. 1984); ***Bludsworth v. State***, 646 P.2d 558 (Nev. 1982); ***Chase v. State***, 678 P.2d 1347 (Alaska Ct. App. 1984); ***Kennedy v. State,*** 640 P.2d 971(Okla. Crim. App. 1982); ***Smith v. State***, 322 S.E. 2d 492 (Ga. 1984); ***State v. Howe***, 386 A.2d 1125 (Vt. 1978); ***State v. Jones***, 259 S. E. 2d 120 (S.C. 1979); ***State v. Peoples***, 605 P. 2d 135 (Kan. 1980); ***Commonwealth v. Henry***, 569 A.2d 929 (Pa. 1990); ***State v. Vital***, 505 So.2d 1006 (La. App. 1987); ***State v. Hill***, 595 N.E. 2d 884 (Ohio 1992), *cert denied,* 507 U.S. 1007 (1993); ***Harward v. Commonwealth***, 364 S.E. 2d 511 (Va. App. 1988); ***Spence v. State***, 795 S.W. 2d 743 (Tex. Cr. App. 1990), *cert. denied*, 499 U.S. 931 (1991); ***People v. Milone***, 356 N.E. 2d 1350 (Ill.1976).

¶78. Two additional states imply that bite mark evidence would be admissible, but held that a ***Frye*** test hearing should be held prior to admission of such evidence. ***Fishback v. People***, 851 P. 2d 884 (Colo. 1993); ***Bloodworth v. State***, 512 A. 2d 1056 (Md. 1986).

¶79. Moreover, this Court in ***Harrison v. State***, 635 So. 2d 894 (Miss. 1994)(Dan Lee, Chief Justice), had the opportunity to rule that bite mark evidence was unreliable, but did not do so. Instead, this Court held that the lower court erred in failing to provide expert witnesses, both in pathology and odonatology, to the defendant. ***Harrison***, in my view, is tantamount to an admission

by this Court of the reliability of bite mark evidence due to our placing the trial court in error for failure to provide Harrison with his own forensic odonatologist. Surely, this Court in **Harrison** recognized the importance of bite mark evidence in allowing the defendant his own bite mark expert in order to refute the State's bite mark expert witness. In the case at bar, Howard's counsel also apparently recognized the importance of a forensic odonatologist to rebut the State's expert and requested such an expert for Howard. Howard, however, was unimpressed and objected due to the delay that this would cause in his trial.

¶80. In refusing to address this first impression issue, the majority ignores the majority view nationwide and particularly the view of our three sister states. This type of expert testimony is not new to jurisprudence in this country. The bottom line to all this is that bite mark evidence by a qualified expert has been allowed by various courts since 1975. Here, in my view, the learned trial judge was correct in allowing Dr. West to testify. Dr. West was imminently qualified as a bite mark expert. The majority appears to be concerned with this particular expert's qualifications, yet fails to so state. Nor does the majority address the role of the trial judge in admitting expert bite mark evidence testimony. Did the trial judge abuse his discretion in allowing Dr. West's testimony? The majority doesn't say. Is this Court still satisfied with the **Frye** test? Again, the majority fails to enlighten the bar. This Court has ducked this issue several times previously. This issue of bite mark evidence admissibility is absolutely going to come up again in this case. Judicial economy demands that this Court address this issue and decide once and for all if bite mark evidence is admissible. The majority is wrong in not doing so.

¶81. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. This Court has noted that the second requirement, that the accused be able to rationally communicate with his attorney, means that "Defendants require a capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel 'without paranoid distrust,' to advise and accept advice from counsel rationally about a pending case which is something more than a superficial capacity to converse with others." **Conner** at 1248.