# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01586-SCT

*EDDIE LEE HOWARD, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/10/2018 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| TRIAL COURT ATTORNEYS: | LOUWLYNN VANZETTA WILLIAMS |
| | ROBERT M. RYAN |
| | WILLIAM TUCKER CARRINGTON |
| | WILLIAM McLEOD McINTOSH |
| | VANESSA POTKIN |
| | M. CHRIS FABRICANT |
| | PETER J. NEUFELD |
| | JASON L. DAVIS |
| | BRAD ALAN SMITH |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM TUCKER CARRINGTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ASHLEY LAUREN SULSER |
| | LADONNA C. HOLLAND |
| | LYNN FITCH |
| | CANDICE LEIGH RUCKER |
| NATURE OF THE CASE: | CIVIL-POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED, RENDERED, AND REMANDED - 08/27/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     Eddie Howard was sentenced to death for the rape and murder of eighty-four-year-old Georgia Kemp. Howard was tied to the crime by Dr. Michael West, who identified Howard as the source of bite marks on Kemp's body. At trial, Dr. West testified that he was a member of the American Board of Forensic Odontology (ABFO) and that he had followed its guidelines in rendering his opinion. But since Howard's trial, the ABFO has revised those guidelines to prohibit such testimony, and this reflects a new scientific understanding that an individual perpetrator cannot be reliably identified through bite-mark comparison. This, along with new DNA testing and the paucity of other evidence linking Howard to the murder, requires the Court to conclude that Howard is entitled to a new trial. We reverse the trial court's denial of postconviction relief and vacate Howard's conviction and sentence.

**FACTS**

¶2.     On the evening of February 2, 1992, one of Kemp's neighbors noticed smoke coming from her home. *Howard v. State*, 853 So. 2d 781, 784 (Miss. 2003). Firefighters were called to the scene and found a small, smoldering fire in Kemp's living room. *Id.* They then found Kemp's body on her bedroom floor. *Id.* The firefighters confirmed that Kemp was deceased and noticed that her legs were bloody and that she was partially exposed. *Id.* They further noticed a bloody knife on the bed and a telephone with its line cut. *Id.*

¶3.     An autopsy was performed by Dr. Steven Hayne on February 3, 1992. The autopsy concluded Kemp had been beaten, strangled, stabbed, and raped. *Id.* at 785. Specifically, bruises and scrapes were found on Kemp's face, head, and neck, and multiple bruises were found on her left shin. *Id.* Injuries consistent with forced vaginal intercourse were noted to

2

both sides of her vaginal vault, and there were also injuries consistent with manual strangulation. *Id.* The cause of Kemp's death was two stab wounds to the left side of her chest that caused severe internal bleeding. *Id.*

¶4. Although the autopsy report did not note any bite marks, Dr. Hayne requested an additional study of Kemp's body on February 6, 1992, because, according to Dr. Hayne, "[t]here was some question that . . . there could be injuries inflicted by teeth." As a result, Kemp's body was exhumed. *Id.* Howard agreed to have dental impressions taken, which showed that Howard had a removable partial denture replacing his upper four front teeth. *Id.* at 784-85.

¶5. On February 7, 1992, Dr. Michael West, a forensic odontologist, examined Kemp's body and, using an ultraviolet light, determined there were otherwise invisible marks on Kemp's right breast, the right side of her neck, and her right arm. *Id.* Dr. West found these marks to be human bite marks, and he used molds of Howard's teeth to perform a "[w]ound duplication test with ink" or direct comparison between the bite mark and Howard's teeth. Dr. West found that the marks on Kemp's neck and arm were "consistent with" Howard's teeth. He further opined (at the time) that the bite mark on Kemp's right breast was "indeed and without doubt inflicted by . . . Howard."

¶6. Howard was arrested on February 8, 1992. *Id.* Howard had lived two blocks away from Kemp. On February 13, 1992, Howard advised Detective David Turner that he "need[ed] to see [Turner] as soon as possible . . . in relation to [his] case." *Id.* When Turner

3

met with Howard, Howard stated that "the case was solved." *Id.* Howard then stated he "had a temper and that's why this happened." *Id.*

¶7. Howard was indicted on the charge of capital murder with the underlying felony of rape. *Id.* Howard, who represented himself at trial, was convicted in 1994 and sentenced to death. *Id.* In 1997, Howard's conviction and sentence were reversed and remanded for a new trial. *Howard v. State*, 701 So. 2d 274 (Miss. 1997).

¶8. Howard's second trial began on May 22, 2000. *Howard*, 853 So. 2d at 785. At trial, Dr. West testified that the bite marks on Kemp's neck and arm were "consistent with" Howard's teeth. Regarding the bite mark on Kemp's right breast, Dr. West found that it was an "identical" match to Howard's dental impressions and testified to a reasonable degree of medical certainty that Howard had inflicted that bite mark, although he also averred that he had "no doubt" Howard had left the mark. Howard was convicted of capital murder and sentenced to death. *Id.* at 786.

¶9. On appeal, Howard raised thirteen assignments of error. *Id.* at 786-87. This Court found no reversible error and affirmed Howard's conviction and death sentence. *Id.* at 799. The United States Supreme Court denied Howard's petition for writ of certiorari. *Howard v. Mississippi*, 540 U.S. 1197, 124 S. Ct. 1455, 158 L. Ed. 2d 113 (2004).

¶10. In 2003, the Mississippi Office of Capital Post-Conviction Counsel was appointed to represent Howard in his postconviction collateral-relief proceedings. *Howard v. State*, 945 So. 2d 326, 335 (Miss. 2006). Howard later filed his first petition for postconviction relief. *Id.* The petition included "four issues in which Howard attack[ed] the bite mark evidence

4

used against him at trial and Dr. West's expert opinion." *Id.* at 348. This Court found no meritorious claims and denied the petition for postconviciton relief. *Id.* at 332, 371. Specifically, the Court stated, "Howard asserts that his conviction and sentence are constitutionally and procedurally flawed and should be vacated. We find the issues raised by Howard are either procedurally barred and/or without merit." *Id.* at 371.

¶11. On December 2, 2010, this Court granted Howard's request for postconviction DNA testing. *Howard v. State*, 49 So. 3d 79, 80 (Miss. 2010). All other issues raised by Howard, including his claims of newly discovered evidence, were dismissed without prejudice to be refiled with the DNA test results. *Id.*

¶12. In August 2015, this Court granted Howard leave to file his petition for postconviction collateral relief in the trial court and ordered the trial court to conduct an evidentiary hearing on the following issue:

> Whether the newly discovered evidence presented in Howard's Motion to Vacate Conviction, including the results of his post-conviction DNA testing, is of such a nature that it "will probably produce a different result or induce a different verdict[] if a new trial is granted." *Crawford v. State*, 867 So. 2d 196, 204 (Miss. 2003) (citing *Meeks v. State*, 781 So. 2d 109, 112 (Miss. 2001)).

*Howard v. State*, 171 So. 3d 495 (Miss. 2015). As a result, Howard filed a motion to vacate conviction and a supplemental memorandum in support of postconviction relief in the trial court. In his motion, Howard asserted that "[o]ver the past decade, the field of bite-mark identification has devolved from a favored forensic science . . . to a craft of forensic charlatanism. It has proved to be completely unreliable, inadmissible, and little more than

5

speculation." "In light of this newly discovered information," Howard requested that the trial court vacate his conviction.

¶13. At the evidentiary hearing, Howard also offered new evidence regarding the forensic and DNA testing on the physical evidence left at the scene of the crime. The nightgown Kemp was wearing at the time of her death tested negative for semen. While human DNA was detected on the inside of the nightgown, male DNA was not. As with the nightgown, no semen or male DNA were detected on either of Kemp's stockings. Kemp's bedroom slippers were tested for the presence of blood. No blood was detected on the left slipper. The right slipper tested presumptively positive for blood, but no male DNA was detected. Both the bottom and top bedsheets were tested for the presence of semen. No semen was detected on the bottom sheet. The testing from the top sheet was either negative or inconclusive for semen. No semen was detected in the sexual-assault kit. Human DNA was detected in Kemp's fingernail scrapings, but no male DNA was detected on either sample.

¶14. Finally, a blood test was performed on the knife. Of the five areas tested, one was positive for blood. That area was located near the tip of the blade. The knife blade and handle were tested for touch DNA. Male DNA was detected on the knife blade, but Howard was excluded as the source.

¶15. After concluding the evidentiary hearing, the trial court entered an order denying Howard's petition for postconviction relief. Specifically, the trial court found that there had been no DNA evidence at the original trial and that Howard had not "present[ed] any new evidence regarding Dr. West or his bite-mark identification that would constitute 'newly

6

discovered evidence [that would] probably produce a different result or induce a different verdict, if a new trial [wa]s granted . . . .'" (alterations in original) (quoting *Crawford*, 867 So. 2d at 204). Howard timely appealed.

## STANDARD OF REVIEW

¶16.    In *Chamberlin v. State*, this Court held that

> [t]his Court has recognized that post-conviction-relief actions have become part of the death-penalty appeal process. The standard of review for capital convictions and sentences is "one of 'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'"

*Chamberlin v. State*, 55 So. 3d 1046, 1049-50 (Miss. 2010) (citations omitted).

¶17.    Also, our standard of review provides that "[w]hen reviewing a [trial] court's decision to deny a petition for post-conviction relief this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Loden v. State*, 971 So. 2d 548, 572 (Miss. 2007) (emphasis omitted) (internal quotation marks omitted) (quoting *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999)). "[T]his Court must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact . . . .'" *Id.* (internal quotation marks omitted) (quoting *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)). "That includes deference to the [trial] judge as the 'sole authority for determining credibility of the witnesses.'" *Id.* at 572-73 (quoting *Mullins*, 515 So. 2d at 1189). "However, 'where questions of law are raised the applicable

standard of review is de novo.'" **Doss v. State**, 19 So. 3d 690, 694 (Miss. 2009) (quoting **Brown**, 731 So. 2d at 598).

¶18.    "The burden of proof at an evidentiary hearing on a [postconviction-relief] case is on the petitioner to show 'by a preponderance of the evidence' that he is entitled to relief." **Id.** (quoting Miss. Code Ann. § 99-39-23(7) (Rev. 2007)).

## DISCUSSION

¶19.    The issue before us is "[w]hether the newly discovered evidence presented in Howard's [m]otion . . . is of such a nature that it 'will probably produce a different result or induce a different verdict[] if a new trial is granted.'" **Crawford v. State**, 867 So. 2d 196, 204 (Miss. 2003) (quoting **Meeks v. State**, 781 So. 2d 109, 112 (Miss. 2001)); **Howard v. State**, 171 So. 3d 495 (Miss. 2015).  "This requires a showing that the evidence is material and is not merely cumulative or impeaching." **Crawford**, 867 So. 2d at 204 (citing **Meeks**, 781 So. 2d at 112).  "Evidence is material only if there is a *reasonable probability* (i.e., 'probability sufficient enough to undermine confidence in the outcome') that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Crawford**, 867 So. 2d at 203 (citing **De La Beckwith v. State**, 707 So. 2d 547, 572 (Miss. 1997) (quoting **United States v. Bagley**, 473 U.S. 667, 681, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985))).

¶20.    As to the serological and DNA testing, the trial court accepted it as newly discovered evidence but found that it did not warrant a new trial because it did not find DNA that "pointed to a different perpetrator."  On this point, we disagree: a reasonable juror could

8

surely conclude that the presence of another man's DNA on the knife blade "point[s] to a different perpetrator." And while it is true that there was no DNA evidence linking Howard to the crime at the time of his trial, the fact that no DNA links Howard to the crime *after* DNA testing is surely new and material. We also observe that the trial court appeared to consider the new DNA testing separately from Dr. West's bite-mark testimony, but the issues are, in fact, intertwined because the new testing did not find Howard's DNA in places it might have been left had Howard bitten the victim as Dr. West concluded.

¶21. As to Dr. West's bite-mark comparison testimony, the circuit court found that the criticism of Dr. West is "very familiar territory" and that "[t]his very familiarity . . . means that this is not new evidence." The circuit court pointed out that Dr. West was aggressively voir dired and cross-examined at trial and has been a controversial figure since before the trial in 2000. Dr. West's methodology was also attacked in his direct appeal, *see Howard v. State*, 853 So. 2d 781, 799-809 (Miss. 2003) (McRae, J., dissenting), and in his first postconviction-relief case, *see Howard v. State*, 945 So. 2d 326, 368-71 (Miss. 2006). The circuit court concluded by quoting this Court's admonition that newly discovered evidence must be "material and . . . . not merely cumulative or impeaching." *Crawford v. State*, 867 So. 2d 196, 204 (Miss. 2003) (citing *Meeks*, 781 So. 2d at 112).

¶22. We cannot agree with this conclusion either. At Howard's trial, Dr. West testified that he was a diplomate (member) of the American Board of Forensic Odontology (ABFO). Dr. West testified that the community of forensic odontologists was quite small and that the ABFO was the only way one could become "board certified" as a forensic odontologist, as

9

he was. Dr. West also testified and that he had followed the ABFO's Guidelines as to the acceptable conclusions he could present to a jury.

¶23. Dr. West went on to testify that he had made a direct comparison between a bite mark on the victim's breast and a mold of Howard's teeth and that this was a generally accepted and ABFO-approved methodology. Dr. West explained that he could reach one of four conclusions from a bite-mark comparison: he could exclude the suspect, he could not exclude the suspect, he could identify the suspect as the source of the bite mark, or he could reach no conclusion.

¶24. Dr. West testified that the bite marks found on Kemp's neck and arm were "consistent with" Howard's teeth, which meant it was "possible" that the bite marks were made by Howard. But Dr. West testified to a reasonable degree of medical certainty that the bite mark on Kemp's breast was an "identical" match to Howard's teeth. He went on to reaffirm his initial conclusion that Howard "indeed and without doubt" inflicted the bite mark on Kemp's breast. In other words, Dr. West identified Howard as the biter or the single individual who could have been responsible for the bite mark on Kemp's breast. As we shall explain in due course, this was the only evidence that strongly linked Howard to the crime.

¶25. In 2000, Dr. West's testimony was consistent with the ABFO guidelines, which approved the following descriptions to relate a suspected biter to a bite mark: the biter, the probable biter, not excluded as the biter, excluded as the biter, and inconclusive. In 2013, however, the ABFO revised its guidelines to prohibit individualization testimony in "open population" cases like this one, in which the number of potential suspects is unknown. And

10

in 2016, the ABFO again revised its guidelines and eliminated individualization entirely. The 2016 revisions only allowed the following conclusions: excluded as having made the bite mark, not excluded as having made the bite mark, or inconclusive. At the hearing on Howard's postconviction- relief motion, Howard presented three experts who explained that while the reliability was not unquestioned, experts in the field widely accepted Dr. West's conclusions as permissible at the time of trial in 2000. The 2013 and 2016 changes to the ABFO Guidelines had resulted from a dramatic change in the scientific understanding and acceptance of the reliability of individualizations in bite-mark analysis in the intervening years. This was newly discovered evidence not available at the time of Howard's trial in 2000. *See Ex parte Chaney*, 563 S.W.3d 239, 275 (Tex. Crim. App. 2018); *State v. Fortin*, No. A-5929-17T2, 2020 WL 3406451, at *13 (N.J. Super. Ct. App. Div. June 22, 2020); *State v. Hill*, 125 N.E.3d 158, 162 (Ohio Ct. App. 2018).

¶26. According to Howard's experts, these changes to the ABFO's Guidelines were prompted by a growing number of wrongful convictions (several of which involved individualization testimony by Dr. West himself), a study published in 2009 by the National Academy of Sciences Report reporting the lack of scientific basis for bite-mark evidence, and research concluding that even board-certified forensic dentists could not reliably identify a human bite mark on human skin, much less compare and accurately match an alleged bite mark to the teeth of a single individual to the exclusion of all others. Therefore, the conclusion that Dr. West proffered to the jury, his identification of Howard as "the biter" (i.e., the only person on the planet who could have created the alleged bite marks) with

"reasonable medical certainty" has not been permitted by the ABFO's Guidelines since 2013 and would not be admissible in a new trial today. *See* M.R.E. 702(c). Were Dr. West, or any other forensic dentist, to testify again, he would not be able to offer the individualization testimony Dr. West gave at trial or offer any type of probabilistic opinion about a suspected match; at most, he or she would be limited to opining that Howard "could not be excluded" as the source of the bite marks.

¶27. We note also that at the trial, Dr. West testified that it was not possible to compute a margin of error for his methods. But in the intervening years, a growing body of scientific research suggests that the error rate for forensic odontologists may be quite high. And Dr. West could be cross-examined concerning his apparent errors in two notable death-penalty cases, that of Levon Brooks and Kennedy Brewer, which were revealed after Howard's trial in 2000.

¶28. At the postconviction-relief hearing, Dr. West maintained that he was confident about his methodology and the reliability of his conclusions. He did not agree with the changes to the ABFO's guidelines regarding individualization conclusions; he "believe[d] a good bite mark can be used to identify an individual." But Dr. West admitted he was no longer an active practitioner and had not been a member of the ABFO since 2006. And he conceded that "you can't do [identification through bite-mark comparison] in the courtroom anymore due to the actions of the [ABFO] and the way the system works." Dr. West averred that he would not testify again, although he attributed this to frustration with the legal system rather than unreliability of his methods. Dr. West denied or explained prior statements he had made

12

under oath suggesting bite-mark analysis was not reliable, but he offered no serious dispute to Howard's experts' testimony that the present ABFO Guidelines reflected a change in the view of the scientific community at large. Nor did any other witness for the State.

¶29. The State does argue that it was suggested the ABFO guidelines are "just guidelines" and are nonbinding, but this is not an accurate summary of the evidence. It was noted that deviation from the guidelines, without justification, would result in discipline or expulsion of the ABFO diplomate. Dr. West himself testified he had been suspended from the organization for violating its guidelines by overstating the confidence of his conclusions in bite-mark matching. And there was no suggestion that individualization testimony would be allowed by the ABFO based on mere disagreement with the guidelines. We also reiterate that at Howard's trial, Dr. West repeatedly emphasized his membership in the ABFO, averred that there was no comparable certifying organization for forensic dentists, and testified that he followed the ABFO Guidelines.

¶30. Finally, we observe that Dr. West testified at Howard's trial that he was "stunned" that a colleague (Dr. Richard Souviron) had suggested bite-mark comparison was generally only reliable to exclude suspects—this is essentially all the current ABFO Guidelines permit. Dr. West added that "twenty years ago [Dr. Souviron] was the top of the profession . . . now he's not." If Dr. West was correct, things appear to have come full circle in the intervening twenty years. The present scientific understanding of the invalidity of identification through bite-mark comparison is a new, material fact that constitutes newly discovered evidence under *Crawford*. *See Crawford*, 867 So. 2d at 203-04.

13

¶31. After reviewing the record, we conclude that Howard's evidence as to the change in the scientific understanding of the reliability of identification through bite-mark comparisons was almost uncontested. Based on this record, we agree with Howard that a forensic dentist would not be permitted to identify Howard as the biter today as Dr. West did at Howard's trial in 2000.

¶32. We also conclude that Dr. West's identification of Howard as the source of bite marks on the victim's body was by far the State's most important evidence at Howard's trial. The other evidence indicating Howard's guilt is limited to the following: that Howard had lived two blocks away from victim, that his former girlfriend testified that he liked to bite her on the breast and neck during intercourse, that Howard had smelled of burnt wood or clothes the day after the murder, and that Howard had made cryptic comments to a detective a few days after he was arrested.

¶33. While we acknowledge that Howard's statements were peculiar and suspicious, they revealed no details about the crime and do not amount to a confession when viewed in their full context. Howard had sent the detective a note asking to speak with him. Howard told the detective "the case was solved," then asked to go by the crime scene because it "might bring back some memories." The detective drove Howard past Kemp's home twice, but both times Howard said it did not bring back any memories. After they returned to the jail, Howard again said the "case was solved" and that the detective should continue investigating because there were "five or six other individuals involved." Howard then asked whether the

14

detective believed Howard was "crazy,"[1] and, after the detective denied that he did, Howard stated, "Well, I'm not. I'm not crazy." Howard then said that he "had a temper and that's why this happened." Howard did not say what "this" was or how his temper had caused it happen. We note also that the statement was not recorded, that the detective was the only witness to it, and that the detective did not ask Howard to put it to writing.

¶34. The issue before us is "[w]hether the newly discovered evidence presented in Howard's [m]otion . . . is of such a nature that it 'will probably produce a different result or induce a different verdict, if a new trial is granted.'" *Crawford v. State*, 867 So. 2d 196, 204 (Miss. 2003) (quoting *Meeks v. State*, 781 So. 2d 109, 112 (Miss. 2001)). We consider Howard's new evidence under the heightened-scrutiny standard required in death-penalty cases. *See Smith v. State*, 499 So. 2d 750, 756 (Miss. 1986) ("In cases where the death penalty has been imposed, thoroughness and intensity of review are heightened."); *Flowers v. State*, 773 So. 2d 309, 317 (Miss. 2000).

¶35. Given the inadmissibility of Dr. West's identification of Howard as the biter, the absence of forensic or eyewitness evidence putting Howard at the scene of the crime, and the newly discovered presence of another man's DNA on the murder weapon, we conclude that

---

[1] Although we do not rely on the record from the first trial to reach the result today, we observe that Howard's first conviction was reversed after this Court found that Howard should not have been permitted to represent himself without the trial court's first holding a competency hearing, given Howard's "strange comments" and "numerous instances of paranoid behavior" at trial. *Howard v. State*, 701 So. 2d 274, 282-83 (Miss. 1997). This Court observed that Howard's defense was "at best incoherent and deluded"; Howard's theory of his defense was that he had been framed by a "conspiracy" including members of his own family. *Id.* at 282. And during his closing argument, Howard "argued to the jury that one of the jurors might have committed the crime." *Id.*

15

Howard met his burden to show by a preponderance of the evidence that in light of his newly discovered evidence, a jury would probably not find him guilty beyond a reasonable doubt. *See Crawford*, 867 So. 2d at 204.

¶36. The circuit court's decision denying Howard's motion for postconviction relief is reversed and rendered. Howard's conviction and sentence are vacated, and we remand this case to the circuit court with directions that it grant Howard a new trial in his criminal case consistent with this opinion.

¶37. **REVERSED, RENDERED, AND REMANDED.**

**RANDOLPH, C.J., KING, P.J., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. KITCHENS, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.; ISHEE, J., JOINS IN PART. MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**KITCHENS, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶38. I concur fully with the majority that Howard's motion for post conviction relief should be granted and that his conviction and sentence should be vacated. I write separately to call attention to additional reasons this Court's decision to grant Howard's petition and vacate his conviction and sentence is correct.

> **I.** **When Howard's new evidence is construed in his favor, as Mississippi law demands, it creates reasonable doubt about whether Howard stabbed Georgia Kemp.**

¶39. This Court has produced a plethora of case law recognizing that, when a person is sentenced to death, we are to review the case with "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Chamberlin v. State*, 55 So. 3d 1046,

16

1049-50 (Miss. 2010) (internal quotation mark omitted) (quoting *Flowers v. State*, 773 So. 2d 309, 317 (Miss. 2000)); *see also* *Evans v. State*, 226 So. 3d 1, 13 (Miss. 2017); *Cox v. State*, 183 So. 3d 36, 44 (Miss. 2015); *Corrothers v. State*, 148 So. 3d 278, 293 (Miss. 2014); *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992); *Fisher v. State*, 481 So. 2d 203, 211 (Miss. 1985); *Gambrell v. State*, 92 Miss. 728, 736, 46 So. 138, 139 (1908). Because of the severity and finality of a death sentence, "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Lynch v. State*, 951 So. 2d 549, 555 (Miss. 2007) (internal quotation marks omitted) (quoting *Balfour*, 598 So. 2d at 739); *see also* *Chandler v. State*, 242 So. 3d 65, 68 (Miss. 2018) ("Heightened scrutiny is reserved for death-penalty cases due to the unique and irreversible nature of that punishment."); *Monge v. California*, 524 U.S. 721, 732, 118 S. Ct. 2246, 141 L. Ed. 2d 615 (1998) ("Because the death penalty is unique 'in both its severity and its finality,' we have recognized an acute need for reliability in capital sentencing proceedings." (citation omitted)). Thus, if an accused in a death penalty case presents evidence that creates *bona fide* doubts about his or her conviction, this Court must give the accused the benefit of those doubts rather than accepting the evidence and inferences that favor the lower court's findings.

¶40.    Additionally, this Court has expounded upon the importance of the application of the heightened scrutiny standard in death penalty cases:

> While there may be legitimate differences of opinion as to just
> when and how "heightened scrutiny" works in death penalty
> cases, it would seem clear that this approach is most needed and
> most applicable in cases resting upon circumstantial evidence

17

> and where the matter of whether the defendant is guilty at all is by no means free of all doubt.

*Fisher*, 481 So. 2d at 211. Howard's case provides an example of cases in which heightened scrutiny review is most needed because the conviction "rest[s] upon circumstantial evidence" and whether Howard "is guilty at all is by no means free of all doubt." *Id.* Dr. West's testimony identifying Howard as the biter "was the only evidence that strongly linked Howard to the crime." Maj. Op. ¶ 24. Without West's testimony, which itself was circumstantial, the State's remaining evidence also is circumstantial, and, in my view, is speculative.

¶41.    None of Kemp's clothing that was tested produced a match for Howard's DNA. *See* Maj. Op. ¶ 13. Neither the fingernail scrapings nor the sexual assault kit yielded a match for Howard's DNA. *See id.* As rightly observed by the majority, "[m]ale DNA was detected on the knife blade, but Howard was excluded as the source." Maj. Op. ¶ 14. The discovery of an unknown man's DNA alone could produce a different result or verdict because "a reasonable juror could surely conclude that the presence of another man's DNA on the knife blade 'point[s] to a different perpetrator.'" Maj. Op. ¶ 20. The DNA results do not place Howard at the crime scene, and those results put the murder weapon within the reach of another male.

¶42.    Because the changes in the standards of the forensic science community regarding bite-mark evidence favor Howard, Dr. West's testimony is eliminated from the State's case. At the time of Howard's trial in 2000, the American Board of Forensic Odontology (ABFO)[2]

---

[2]The ABFO is the leading governing organization in the field of forensic odontology.

18

guidelines permitted an expert to identify a suspect as either "the biter, the probable biter, not excluded as the biter, excluded as the biter, [or] inconclusive." Maj. Op. ¶ 25. In 2013, the ABFO revised its guidelines "to prohibit individualization testimony in 'open population' cases." *Id.* But the 2013 guidelines continued to permit the use of the above classifications for identification purposes in certain cases. The ABFO revised its guidelines again in 2016. Sixteen years after Howard's trial, the ABFO recognized the unreliability of the use of bite marks for identification purposes in all cases and revised its guidelines to that effect. The ABFO guidelines no longer permit an expert to identify a suspect as the biter, but only to opine whether a person is "excluded as having made the bite mark, not excluded as having made the bite mark, or inconclusive." *Id.* This extreme revision of guidelines by the ABFO precludes Dr. West's identification testimony at a retrial of this case. Without that testimony, the State cannot place Howard at the scene of the crime. Courts in other states have recognized the doubts created by the change in the forensic science community regarding bite-mark evidence by reversing those convictions that relied heavily on bite-mark identifications. *See* ***Commonwealth v. Kunco***, 173 A.3d 817, 821 (Pa. 2017); ***Ex Parte Chaney***, 563 S.W.3d 239, 264 (Tex. Crim. App. 2018).

## II. On PCR, the trial court erred by holding Howard to an evidentiary standard of beyond a reasonable doubt rather than to the correct preponderance of the evidence standard.

¶43. In denying Howard's petition for post conviction relief, the trial judge determined that "[w]hile no DNA evidence was found that implicated the Petitioner in the crime, no DNA evidence was found that pointed to a different perpetrator." The effect of the judge's logic

is that, in order for Howard to satisfy his burden, he would have to do the job of the police and find Kemp's real killer. Thus, the trial judge would require him to prove his innocence. Of course, Howard is not required to solve the case. He needs only to show by a preponderance of the evidence that the new DNA results and the change in the forensic science community's standards regarding bite-mark identification likely would produce a different verdict or outcome. *See* Miss. Code Ann. § 99-39-23(7) (Rev. 2015) ("No relief shall be granted under this article unless the petitioner proves by a preponderance of the evidence that he is entitled to the relief.").

¶44.   The DNA results showed that Howard's DNA was not found on any of the items tested. The results showed also that another male, not Howard, had been in contact with the murder weapon. This new evidence amplifies the reality that *nothing*—no evidence whatsoever—connects the knife to Howard.

¶45.   Howard has shown also that the revision of the ABFO guidelines regarding bite-mark identification nullifies Dr. West's testimony. In addition, Howard called three experts in the field of forensic odontology to testify at the evidentiary hearing. They refuted West's methodology and his conclusions and presented the current view of bite-mark identification in the forensic science community.

¶46.   Dr. Iain Pretty discredited Dr. West's testimony for the following reasons: (1) new research shows that an expert cannot reliably distinguish a human bite mark from other injuries; (2) there were no visible bite marks on Kemp's body from the autopsy photos; (3) the alleged bite marks were not photographed; (4) the facts that Kemp's body had been

20

unembalmed and buried had a negative impact on the ability to assess an injury, particularly in "terms of distortion, in term[s] of the ability to collect evidence, in terms of the postmortem changes"; and (5) Dr. West's observation of the supposed bite marks under ultraviolet light is questionable due to there not having been the usual "overlying injury on the [victim's] skin[.]" Dr. Mary Bush testified that, based on her research, "[t]he skin is just not a reliable recording medium" because it fails to record the uniqueness of a human bite mark.

¶47. Judge Christopher Plourd[3] testified that he had administered a blind proficiency test[4] on bite-mark analysis to Dr. West in 2001. According to Judge Plourd, Dr. West failed the blind proficiency test because he identified the wrong perpetrator and "his procedures, his methods that he used to evaluate this bite mark with the known dentitions were unreliable and did not properly identify the individual."

¶48. Therefore, Howard has shown by a preponderance of the evidence that the presence of an unknown male's DNA on the murder weapon and the forensic science community's current disapproval of bite-mark identification provide reasonable doubt about Howard's guilt.

---

[3]Judge Plourd has been a superior court judge in the state of California since 2011. At the time of his testimony, Judge Plourd testified that he was the chairman of the "Organization of Scientific Area of Committees, which is part of the Forensic Science Standards Board operated by the United States Department of Justice and NIST [National Institute of Standards and Technology]."

[4]Judge Plourd testified that the "blind proficiency test is designed to evaluate the reliability of the method that is of interest[]" and that the test is administered in a way "to try to make it as close as possible to a real life case[.]"

**III.     This Court should not uphold a conviction and death sentence on the testimony of a proven unreliable witness, Dr. West.**

¶49.     Not only have the ABFO guidelines changed, but Dr. West's credibility also has been destroyed since Howard's trial. In the intervening years, West and his methodology have plunged to overwhelming rejection by the forensics community to the point that today his methodology is not at all supported by mainstream forensic odontologists. In fact, West's methods are wholly contradicted and disqualified by today's ABFO guidelines.

¶50.     Dr. West testified that it was not possible to compute his margin of error because his craft is "a subjective art and science." But we know now that Dr. West's work is fraught with error because his history includes trial testimony that has led to the conviction of the innocent. Most notable are the cases of Levon Brooks and Kennedy Brewer. *See Brooks v. State*, 748 So. 2d 736 (Miss. 1999); *Brewer v. State*, 819 So. 2d 1169 (Miss. 2002); *Brewer v. State*, 725 So. 2d 106 (Miss. 1998); *see also* Maj. Op. ¶ 27. In those capital murder cases West had claimed that each victim had been bitten by a human and that he was able to identify each suspect as the biter in his case by comparing dental impressions to the wounds. It later was proved that the bite marks examined by Dr. West had been made by insects, not humans. Post-conviction DNA testing and a subsequent confession from the real perpetrator[5] provided confirmation that the two men were innocent. The methods used by Dr. West in the Brooks and Brewer cases are the same methods he employed in Howard's case.

---

[5]Post conviction DNA testing identified the true perpetrator, Justin Albert Johnson, who confessed to both murders and volunteered detailed accounts of his crimes, including kidnaping the victims, raping them, murdering them, and then disposing the bodies. Johnson said that he acted alone and that he never bit the victims.

22

¶51. The circumstances surrounding Dr. West's discovery of the alleged bite marks on Ms. Kemp's corpse and the way in which his testimony was presented to the jury are concerning as well. An autopsy was performed by Dr. Steven Hayne the day after the murder, February 3, 1992. ***Howard v. State***, 945 So. 2d 326, 333 n.1 (Miss. 2006). Hayne had found that there were no "injuries to Kemp's right forearm, right side of her neck, or to her right breast." ***Id.*** After Kemp's body was buried and three days after the autopsy, Dr. Hayne had the body exhumed because "[t]here was some question that . . . there could be injuries inflicted by teeth." Even though the autopsy report made no mention of possible bite marks, Kemp's body was exhumed on February 7, 1992. ***Id.*** The already-decomposing body then was examined by Dr. West, who, "using an ultraviolet light, determined there were otherwise invisible marks on Kemp's right breast, the right side of her neck, and her right arm." Maj. Op. ¶ 5. Only with the use of ultraviolet light could Dr. West, and he alone, observe these alleged bite marks. Despite Dr. West's claims that he took photographs of these alleged bite marks he claimed to have found, the photographs appeared to have vanished.[6] But there were autopsy photographs taken and admitted into evidence. After examining the autopsy photographs, Dr. Pretty could not find any "photographic evidence for [the bite marks] whatsoever" or any "overlying injury" on the body.[7] This is significant because Dr. Pretty

---

[6]No such photographs were admitted into evidence at trial or at the PCR hearing. Dr. Pretty testified that of the photographs that were provided him, none were ultraviolet light photographs.

[7]When asked if the lack of photographs invalidated Dr. West's testimony, Dr. Pretty responded:

Well, I'm unable to verify. We talked about the reliability of science. We

testified that generally, in cases in which ultraviolet light is used, "there is an overlying injury on the skin that alerts an individual to the presence of that injury. So it's not a piece of completely uninjured skin that we're just going to randomly photograph with [ultraviolet light] and, hey, look, there's something there."

¶52. Since Dr. West's trial testimony was presented without photographs of the alleged bite marks, the jury was left to make its decision on the basis of the flawed opinions of a witness who since has been proved to have given false and misleading testimony. The jury was left to rely also on testimony that would not be allowed in courts today. *See* M.R.E. 702.

¶53. The circuit court determined that the discrediting of Dr. West and his methods "is not new evidence" and "Dr. West was aggressively voir dired and cross-examined at trial[.]" Maj. Op. ¶ 21. But when Dr. West testified against Howard in 2000, the ABFO guidelines at that time provided his testimony considerable protection on cross-examination. Current ABFO guidelines would not protect or even permit the same testimony today. *See* M.R.E. 702. The ABFO has revised its guidelines from allowing the use of bite marks to identify a person to using them only for the purpose of excluding a person. The new guidelines would result in the exclusion of West's testimony at a new trial.

---

talked about how science should be [reproducible]. We've been denied the opportunity to assess the bite mark because there's no photograph of it. We've been denied the opportunity to examine the characteristics and features that Dr. West describes that he saw because we have no photograph of [the bite mark]. We've been denied the opportunity to repeat any analysis on the comparison between the cast of the bite mark because we have no photograph of it. So one is unable to verify what Dr. West did or didn't see because there is no documentation of it in existence.

¶54. The State contends that "the ABFO Guidelines are 'just guidelines' and are nonbinding[.]" Maj. Op. ¶ 29. But according to Mississippi Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

The rule requires the testimony to be "the product of reliable principles and methods." M.R.E. 702(c). The current ABFO guidelines and the forensic science community have determined that bite-mark evidence should not be used for identifying a suspect due to its unreliability. *See* Maj. Op. ¶¶ 25, 26. Thus, Dr. West's trial opinions were based on unreliable principles and methods. This is demonstrated by Judge Plourd's blind proficiency test, which Dr. West failed.

IV. **Howard's new evidence brings the State's other evidence into question.**

¶55. We have held that, when reviewing a trial court's denial of a post-conviction relief claim, this Court is to consider the entire record. *Loden v. State*, 971 So. 2d 548, 572 (Miss. 2007); *see also* *Goodin v. State*, 102 So. 3d 1102, 1113 (Miss. 2012) ("After careful examination of the entire record . . . ."). Therefore, we consider how Howard's new evidence,

which was not available at the time of Howard's direct appeal, affects the State's other evidence.

¶56.   In Howard's last appeal, the record before this Court contained no DNA evidence and Dr. West's bite-mark testimony still was accepted by the forensic science community and was the only evidence that could physically place Howard at the crime scene. *See Howard v. State*, 853 So. 2d 781, 788 (Miss. 2003); *Howard v. State*, 945 So. 2d 326, 338, 369 (Miss. 2006). The elimination of Dr. West's opinions calls into question the sufficiency of the State's remaining evidence. Howard's new evidence casts a different light on the State's other evidence and, resolving any *bona fide* doubts in Howard's favor, a comparison of the State's remaining evidence to the new evidence likely would lead a jury to produce a different verdict. Howard's new evidence seriously undermines his conviction.

¶57.   The other evidence on which the State relied consists of an ex-girlfriend's testimony about how Howard smelled of smoke and how he enjoyed biting her during intercourse, Howard's having resided two blocks from the victim, and Howard's statements to police that "the case was solved" and that he "had a temper and that's why this happened." *Howard*, 853 So. 2d at 785.

¶58.   Having tried capital murder cases for many years as a prosecutor and as a defense attorney, I am not convinced that a jury still would find Howard's so-called confession incriminating when considered in conjunction with the new DNA results and in the absence of Dr. West's identification testimony. Police Investigator Turner testified that Howard told him

that the case was solved and . . . that there was-uh-five or six other individuals involved and to keep investigating the case, that I would [] find out [] their roles [] in this case. Uh-and he asked me if I thought he was [] crazy. I looked at him and I said, ["]no, man-you know, I don't think you're crazy["] and he said ["]well I'm not. I'm not crazy["] and he said ["]I had a temper and that's why this happened.["] And when he said that, I mean shock just went across my body and I felt like at that point this was the guy that had actually committed the murder.

*Id.* at 785. Turner was the only witness to Howard's statement, which was not recorded, and "Turner did not ask Howard to write and sign a statement." *Howard*, 945 So. 2d at 334 n.3. Howard's statement lacked details of the crime, which usually are present in a confession. In fact, Justice James Graves wrote in his separate opinion that

I find that the affidavits provided by Howard, combined with the legitimate skepticism regarding the testimony of Dr. West and the fact set out by the majority that "[t]he only evidence linking Howard to the crime scene was his alleged statement to Detective Turner that the case was 'solved' and the bite mark identification" are clearly "sufficient to undermine confidence in the outcome."

*Howard*, 945 So. 2d at 372 (Graves, J., concurring in part and dissenting in part). Similarly, I find it unlikely that the discovery of some unknown man's DNA at the crime scene and the elimination of Dr. West's scientifically unsound bite-mark identification would be overcome by the curious and cryptic statement allegedly made by Howard to a lone police officer who failed to record it.

¶59.    While it may be true that Howard's residence was two blocks from Kemp's, no witnesses, no DNA, and no physical evidence placed Howard at the scene of the crime on the day of the murder. If residing two blocks from a crime scene and a nonsensical,

27

unrecorded statement to a policeman are enough to affirm a death sentence, this Court has redefined its duty to review death sentences with heightened scrutiny.

¶60.    The absence of Dr. West's testimony not only affects the sufficiency of the State's other evidence but impacts its relevance as well. Without West's testimony to support the existence of the bite marks, the ex-girlfriend's testimony regarding Howard's purported tendency to bite her during intercourse would lose its relevance and likely would be deemed inadmissible.

### V.    Conclusion

¶61.    When the DNA results and the revised forensic odontology standards applicable to bite-mark identifications are considered together, reasonable doubt is created, and the State no longer has evidence that connects Howard to the murder. Howard has shown by a preponderance of the evidence that his new evidence probably would lead to a different verdict. For these reasons and the reasons stated by the majority, I would grant Howard's petition for post conviction relief, vacate his conviction and sentence, and remand this case for a new trial.

**KING, P.J., JOINS THIS OPINION.  ISHEE, J., JOINS THIS OPINION IN PART.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶62.    Because the newly discovered evidence presented in Howard's petition for post-conviction relief is not of such a nature that it would "probably produce a different result or induce a different verdict[] if a new trial is granted," I respectfully dissent.

*Crawford v. State*, 867 So. 2d 196, 204 (Miss. 2003) (citing *Meeks v. State*, 781 So. 2d 109, 112 (Miss. 2001)).

       *I.     DNA Testing*

¶63.    Howard argues that "the newly discovered results of DNA testing on the nightgown, the knife, and [the] knife blade would probably produce a different result or verdict in a new trial." Regarding the nightgown, Howard claims that "the DNA analysis failed to identify biological material that one would expect to find had the victim in fact been bit." Specifically, he explains,

> The DNA laboratory screened the nightgown that Ms. Kemp was wearing when her body was discovered. Given the number and location of the claimed bite marks, one could expect to find the presence of amalyse, an enzyme found at high levels in saliva, on areas of the clothing on or around the marks' locations, namely the shoulder, neck, and right breast. After collecting swabbings and cuttings from the relevant areas and performing tests, no saliva was detected. Nor was any male DNA detected at all.

Regarding the knife, Howard argues that because he was "conclusively excluded as the source of the male DNA," the results offer exculpatory evidence. I disagree.

¶64.    We must begin with the trial court's conclusion. The trial court made the following findings and conclusion about the DNA testing:

> Concerning the issue of DNA evidence, the Court finds that the absence of the Petitioner's DNA in the items tested is not new evidence that would "produce a different result or induce a different verdict." *Crawford v. State*, 867 So. 2d 196, 204 (Miss. 2003). While no DNA evidence was found that implicated the Petitioner in the crime, no DNA was found that pointed to a different perpetrator. The lack of evidence linking Howard to the crime scene[8] was

_____

[8] Footnote 8 in the trial court's opinion stated,

DNA testing was not originally done on any crime scene items since the

used in argument to the jury by Petitioner's defense counsel in his second trial, and the Court granted a defense jury instruction that instructed the jury to find Howard not guilty if there was reasonable doubt he was not present and did not commit the crime. Therefore, the Court finds that a new trial should not and will not be granted on the issue of lack of DNA evidence linking Petitioner to crime scene.

The trial court determined that although the DNA test results were newly discovered evidence, the fact that there was no DNA evidence linking Howard to the crime was not new.

¶65. The majority finds that "a reasonable juror could surely conclude that the presence of another man's DNA on the knife blade 'point[s] to a different perpetrator.'" Maj. Op. ¶ 20. I agree that the presence of another male's DNA on the knife is significant. But the fact that the DNA was on the blade and not the handle is also significant. This evidence certainly would provide a reasonable inference to the jury that another male was involved. But the presence of another male's DNA on the knife blade does not exonerate Howard or conclusively establish that the other male murdered Kemp.

¶66. The record reflects that the knife had been examined for latent fingerprints and handled numerous times since the 1992 murder. DNA analyst Barbara Leal agreed that the fact that the murder weapon had been handled by multiple individuals could have affected the testing of the knife because DNA could have been deposited from those individuals who handled the knife during the intervening decades. She testified that it "depend[ed] on how it was handled."

Mississippi Crime Lab did not have that capability in 1992; rather they checked for fingerprints, seminal fluid, blood type, and ethnic make-up of hairs. Leave was given to the MOCPCC to seek DNA testing in preparation for Howard's first petition for postconviction relief, but no testing was done at that time.

¶67.  While I agree with Howard that the DNA results are newly discovered and are significant, I agree with the trial court that the newly discovered results will probably not "produce a different result or induce a different verdict[] if a new trial is granted." *Crawford*, 867 So. 2d at 204 (citing *Meeks*, 781 So. 2d at 112).  Instead, the DNA results simply confirm what was already established at trial—a lack of DNA evidence linking Howard to the crime scene.  Accordingly, I do not find that the trial court clearly erred by denying Howard's motion on this ground.

## II.    Bite-Mark Evidence

¶68.  Howard's arguments regarding the bite-mark evidence include the following:

(1)     "[t]he American Board of Forensic Odontology's [ABFO] rejection of both individualization conclusions (i.e. conclusions that a person could definitely be identified as 'the biter') and probabilistic conclusions (i.e. conclusions that a particular person was the 'likely' or 'probable' biter) is newly discovered evidence requiring a new trial," and

(2)     "[t]he change in the scientific community's view and understanding of bite mark evidence is newly discovered evidence requiring a new trial."

¶69.  At Howard's trial in 2000, Dr. West testified that the bite marks found on Kemp's neck and arm were "consistent with" Howard's teeth, which meant it was "possible" that the bite marks were made by Howard.  But Dr. West testified that the bite mark on Kemp's breast was an "identical" match to Howard's teeth and opined that Howard "indeed and without doubt" inflicted the bite mark on Kemp's breast.  In other words, Dr. West identified Howard as the biter or the single individual responsible for the bite mark on Kemp's breast.

¶70.  In 2000, ABFO guidelines approved the following descriptions to relate a suspected biter to a bite mark: the biter, the probable biter, not excluded as the biter, excluded as the

31

biter, and inconclusive. In 2013, the ABFO revised its guidelines and still approved of the use of the term "the biter" but not in open population cases in which the universe of potential suspects is unknown. In 2016, the ABFO again revised its guidelines and eliminated the use of the term "the biter." Instead, the 2016 revisions only allowed the following terms to relate a questioned dentition to a bite mark: excluded as having made the bite mark, not excluded as having made the bite mark, or inconclusive.

¶71. Howard asserts that these changes to the ABFO guidelines are "newly discovered, material evidence" that "reflect the current consensus of the scientific community that bite mark evidence is unreliable and unfit for court." Howard contends that due to the changes in the ABFO guidelines and in the scientific community's understanding of bite-mark evidence, Dr. West's testimony, particularly his identification of Howard as the biter or the only source of the alleged bite mark, "would plainly be inadmissible today." As a result, he argues that the newly discovered evidence would produce a different outcome if a new trial was granted. I disagree.

¶72. The record reflects that while the ABFO guideline changes are new, the criticism of Dr. West and his methodology as well as the validity and reliability of bite-mark evidence are not new.

¶73. During Howard's trial in 2000, defense counsel extensively cross-examined Dr. West regarding his qualifications as an expert and the validity of bite-mark evidence in general. Defense counsel questioned Dr. West regarding his suspension from the ABFO due, in part, to Dr. West's "fail[ure] to act in a impartial manner," and defense counsel further discussed

Dr. West's resignation from the American Academy of Forensic Science due to an allegation that he had lied in court. Moreover, defense counsel questioned Dr. West about his methodology and how other experts in his field disagreed with his methods. Notably, when asked whether he had ever "computed [his] margin of error as a forensic odontologist," Dr. West replied, "[t]hat's not possible because it's a subjective art and science." Defense counsel concluded during closing arguments as follows:

> [Bite mark identification] is a tool of exclusion, not - not reliable for identification. You know, he's got some other problems even on top of that. He, ug-I'd heard this one before, but it-it astounds me every time I think about it-is when he's asked about his . . . margin of error rate . . . and he said there is none, and in Louisiana, as he told you today, he told the court down there that it was something less than Jesus Christ. Ego; that's not ego, ladies and gentlemen, that is arrogance, and it's arrogance that translates into a so-called scientist who is not a scientist. . . . The problem with this case . . . comes back to Doctor Michael West.

¶74. Additionally, the criticism of Dr. West and bite-mark identification were noted in Presiding Justice McRae's dissenting opinion on direct appeal. *Howard*, 853 So. 2d at 799-807 (McRae, P.J., dissenting). Specifically, Presiding Justice McRae stated, in part, as follows:

> The "expert odontology testimony" of Dr. West should not have been submitted to the jury as it is "junk science" and not generally accepted by the scientific community as required by then Rule 702 of the Mississippi Rules of Evidence and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Likewise, neither Dr. West nor his "junk science" meet the standards and requirements for admission under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and revised Rule 702 of the Mississippi Rules of Evidence.
>
> Bite mark identification is not a reliable discipline and lacks generally recognized criteria or methodology. *This Court has recognized that there are serious disagreements in the forensic scientific community about whether a*

33

*defendant can be uniquely identified on the basis of teeth marks. See **Brooks v. State**, 748 So. 2d 736, 739 (Miss. 1999); **Howard v. State**, 701 So. 2d 274, 288 (Miss. 1997). Critics of bite mark identification have found that the forensic odontology community is not convinced of the reliability or credibility of such science. **State v. Ortiz**, 198 Conn. 220, 502 A.2d 400, 403 (1985); **People v. Milone**, 43 Ill. App. 3d 385, 2 Ill. Dec. 63, 356 N.E.2d 1350, 1356 (1976); **Howard**, 701 So. 2d at 288; **Spence v. Texas**, 795 S.W.2d 743, 750-51 (Tex. Crim. App. 1990); Faigman, Kaye, Saks & Sanders, Modern Scientific Evidence: The Law And Science Of Expert Testimony, § 24-1.0, at 157-58 (West 1997). Areas of bite mark identification which are still the subject of disagreement in the forensic odontology community include: (1) the timing of the bite mark injury; (2) enhancement procedures and techniques (such as the use of ultraviolet light); (3) the type of material for test bites or the accuracy of test bites under various mockup conditions; (4) the pressure necessary to produce the various levels of tissue injury under normal and unusual circumstances; (5) manipulation of and various types of distortion to produce correction; (6) whether in fact another set of teeth could have produced the same or similar marks; (7) no universal agreement on which injuries are bite mark related; and (8) research on the minimum number of points of concordance or the minimum number of teeth marks needed in a bite mark for certainty is also not well established. **Brooks**, 748 So. 2d at 748 n.2 (citing Faigman, Modern Scientific Evidence, § 24-2.3, at 178-80).*

Additionally, Dr. West himself has been a controversial character in the field of forensic odontology. On several occasions, Dr. West has been held to have exaggerated the reliability of his disciplines and has proceeded to testify outside the scope of his expertise. *See **Stubbs v. State***, 845 So. 2d 656, 669 (Miss. 2003); **Brooks**, 748 So. 2d at 749-50; **Brewer v. State**, 725 So. 2d 106, 126 (Miss. 1998). In fact, in 1994, the American Academy of Forensic Science instituted an ethics investigation against Dr. West with regard to testimony he had given during a murder trial here in Mississippi. Ultimately, Dr. West was given the opportunity to resign from the organization before being expelled. Since that time, Dr. West has been allowed to re-enter the organization. . . .

. . . .

. . . Dr. West's testimony should not have been admitted, since the methodology and procedure employed for bite mark identification are not generally accepted. As stated earlier, the scientific community, specifically the forensic odontology community, has not accepted Dr. West's methodology and testing techniques. *See **Brooks***, 748 So. 2d at 739; **Howard**, 701 So. 2d at 288; Faigman, Modern Scientific Evidence, §§ 24-1.0 at 157-58, 24-2.3 at 178-80.

*This Court has recognized that the methodology and techniques used by Dr. West are criticized and scrutinized by the scientific community. See Brooks, 748 So. 2d at 739; Howard, 701 So. 2d at 288. With these revelations, how can this Court stand by and allow Dr. West to testify and give an opinion as an expert to procedures, methodology, and testing which have not been adopted by his own scientific community?*

*Howard*, 853 So. 2d at 799-807 (McRae, P.J., dissenting) (emphasis added) (footnote omitted).

¶75. Moreover, the attacks on Dr. West and the validity of bite-mark evidence were discussed in this Court's opinion denying Howard's first petition for post-conviction collateral relief. *Howard*, 945 So. 2d at 348-71. This Court found Howard's trial counsel was not ineffective by failing to obtain a bite-mark expert to counter Dr. West's testimony. *Id.* at 352. We held that while the failure to call an expert witness was deficient performance, Howard "ha[d] not proven prejudice to his defense . . . ." *Id.* We explained,

In support of his post-conviction claim, Howard has offered numerous expert affidavits and other documents which attack Dr. West, his testimony, and bite mark evidence in general. These affidavits and other documents point out how many times Dr. West has been proven wrong and they discuss how unscientific his methods are. One affidavit even states that Dr. West made a mis-diagnosis in Howard's case, but, it does not go on and opine that Howard did not bite Kemp. Just because Dr. West has been wrong a lot[] does not mean, without something more, that he was wrong here. Howard has failed to sufficiently prove that there is "a reasonable probability" that the "result of the proceeding would have been different." [*Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)].

*Id.*

¶76. This Court further rejected Howard's assertion that Dr. West's testimony was improperly admitted. *Id.* at 368-69. Similar to his arguments before us now, Howard argued that "Dr. West's methods in the field of forensic odontology lack[ed] relevancy and

35

reliability, [were] not grounded in the methods and procedures of science, [were] not supported by appropriate validation, [were] not derived from the scientific method, and [were] not scientifically valid." *Id.* at 368. Howard claimed his due-process rights were violated as a result of Dr. West's testimony. *Id.* But this Court found that Howard's argument had been considered and rejected on direct appeal and, as a result, was barred from relitigation by the doctrine of res judicata. *Id.* at 368-69.

¶77. Additionally, various articles and reports that predate Howard's trial have discussed opinions similar to those of Howard's expert witnesses, Drs. Mary Bush and Iain Pretty. For instance, Dr. Bush opined that "[e]ven if you assume that the human dentition is unique[,] the skin does not faithfully record that uniqueness." In other words, "[t]he skin is . . . not a reliable recording medium." But an article published in 1969 entitled *Forensic Odontology* found that

> [b]itemarks can never be taken to reproduce accurately the dental features of the originator. This is due partially to the fact that bite marks generally include only a limited number of teeth. Furthermore, the material (whether food stuff or human skin) in which the mark has been left is usually found to be a very unsatisfactory impression material with shrinkage and distortion characteristics that are unknown.

S. Keiser-Nelson, *Forensic Odontology*, 1 U. Tol. L. Rev. 633, 636 (1969).

¶78. Notably, at Howard's trial in 2000, defense counsel questioned Dr. West regarding this exact issue—whether the skin was a good medium for recording bite marks—noting factors such as distortion, mechanics of a bite, varying thickness of skin, whether there is bone underneath the skin, and the positioning of the body at the time the bite is inflicted. Dr. West explained to the jury that there was "a lot of work and a lot of discussion" regarding

36

"how good an impression skin is." He acknowledged that "there's always going to be inherent distortion in the bite mark on human skin."

¶79. Dr. Pretty criticized Dr. West's methodology and testified regarding the scientific invalidity of bite-mark identification. He explained that unlike Dr. West, he had never identified an individual in a bite-mark case; he had only excluded individuals. Dr. Pretty discussed a study he presented in 2015 regarding the validity of bite-mark analysis. According to Dr. Pretty, the study exposed the unreliability of bite-mark analysis and added further doubt to the use of bite marks in criminal cases. But a report published in 1975 entitled *Some Laboratory Studies on the Accuracy of Bite Mark Comparison* found that identification from bites in non-vital pig skin was unreliable and suggested that similar difficulties may be encountered in the assessment of bites in human skin. D.K. Whittaker, *Some Laboratory Studies on the Accuracy of Bite Mark Comparison*, 25 Int'l Dental J. 166-71 (1975). The report concluded that "[e]xpert witnesses involved in presenting evidence on bite marks in a court of law should be aware of the difficulties of making valid comparisons even under standardized laboratory conditions." *Id.*

¶80. Importantly, as with Dr. Bush's opinions, Dr. Pretty's position was noted by defense counsel at Howard's trial. Specifically, defense counsel argued to the jury that bite-mark identification was "a tool of exclusion, not . . . reliable for identification."

¶81. In support of his argument regarding the invalidity of bite-mark evidence, Howard relies on various cases including *Commonwealth v. Kunco*, 173 A.3d 817 (Pa. 2017), *Ex*

*parte Chaney*, 563 S.W.3d 239 (Tex. Crim. App. 2018), and *State v. Sheila Denton*, No. 04R-330 (Ware County, Ga., Super. Ct. Feb. 7, 2020).

¶82.    In *Kunco*, the State presented two expert witnesses who testified regarding bite-mark evidence.  *Kunco*, 173 A.3d at 824.  Both expert odontologists testified to a reasonable degree of dental certainty that Kunco's teeth made the bite mark on the victim's shoulder. *Id.* Approximately twenty-five years after his conviction, Kunco petitioned for post-conviction relief and for DNA testing.  *Id.* at 820.  The trial court did not address the petition for post-conviction relief but granted Kunco's request for DNA testing "[d]ue to the questionable nature of the Commonwealth's evidence . . . ." *Id.* at 824-25.  In doing so, the trial court relied heavily on the fact that both of the State's expert witnesses stated that they would no longer testify as they had at trial because the scientific knowledge and understanding on which their conclusions were based had changed significantly since trial. *Id.* at 821.  On appeal, the court affirmed the trial court's grant of post-conviction DNA testing "[s]ince the Commonwealth's case [wa]s not overwhelming . . . ." *Id.* at 824-25.  The appellate court explained that the Commonwealth's bite-mark evidence was "a crucial component of the Commonwealth's trial evidence" and that its other evidence, while relevant and probative, was "nowhere close to overwhelming evidence of guilt." *Id.* at 824.

¶83.    In *Denton*, the State presented expert testimony from a forensic dentist who testified that an injury found on the defendant was a bite mark to a reasonable scientific certainty and that an injury found on the victim was probably a bite mark.  *Denton*, No. 04R-330, at *4. The expert forensic dentist opined that "[the defendant] was the probable source of the bite

mark on [the victim] and that [the victim] was the probable source of the bite mark on [the defendant]." *Id.* The defendant was convicted of murder and her conviction was affirmed on direct appeal. *Id.* at *1. More than ten years later, the defendant filed a motion for a new trial and alleged that developments in the understanding of bite-mark analysis and comparison showed that the expert testimony today would no longer be inculpatory. *Id.* at *2. After an evidentiary hearing, the trial court granted the defendant's motion for a new trial. *Id.* at *25. In doing so, the trial court relied on expert testimony from two forensic dentists who both opined that the testimony presented at trial would no longer be permitted or would be inconsistent with the current scientific understanding of bite marks. *Id.* at *8-9.

¶84.    In *Chaney*, the State presented expert testimony from two forensic odontologists who testified that the mark found on the victim's body was a human bite mark made by the defendant at the time of the murder. *Chaney*, 563 S.W.3d at 250. One of the expert witnesses testified that the defendant's dentition was a "perfect match" to the bite mark made on the victim's body and that there was only a "[o]ne to a million" chance that someone other than the defendant bit the victim. *Id.* (internal quotation marks omitted). The other expert witness testified that he was "certain" that the defendant was the person who bit the victim. *Id.* The defendant was convicted of murder and sentenced to life imprisonment. *Id.* at 244. After his conviction, the defendant petitioned for a writ of habeas corpus based on a change in science relied on by the State at trial. *Id.* at 255. In support of his petition, the defendant relied on various reports and affidavits including an affidavit from Dr. Bush, an odontology report and affidavit from Dr. Pretty, and an affidavit from one of the expert witnesses who

testified at trial. *Id.* at 257. The court found that "[t]he body of scientific knowledge underlying the field of bite-mark comparisons ha[d] evolved since [the defendant's] trial in a way that contradicts the scientific evidence relied on by the State at trial." *Id.* at 260. The court granted the defendant's petition and concluded that the defendant "ha[d] shown by clear and convincing evidence that 'no reasonable juror would have convicted [him] in light of the new evidence.'" *Id.* at 278 (second alteration in original) (quoting *Ex parte Kussmaul*, 548 S.W.3d 606, 636-37 (Tex. Crim. App. 2018)).

¶85. Despite Howard's reliance on these cases, *Chaney*, *Kunco*, and *Denton* are distinguishable. In *Chaney*, the defendant relied on a criminal statute that allowed a defendant to move for post-conviction relief based on a change in science relied on by the State at trial. *Id.* at 255. The State conceded that forensic science related to bite-mark comparison had evolved since trial. *Id.* at 258. But in addition to the change in science, the State further conceded that its expert had presented "false wound-aging testimony": the expert had testified at trial that the bite was inflicted at the time of death but later opined that the bite was inflicted days before the murder. *Id.* at 261, 262, 264-65. Additionally, the State's expert admitted that his trial testimony was knowingly false. *Id.* at 264. Specifically, the expert "confesse[d] that he knew at the time of trial that the body of science did not support his 'one to a million' testimony." *Id.* Moreover, the State had suppressed favorable evidence material to the defendant's guilt in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *Chaney*, 563 S.W.3d at 274.

¶86.    Here, unlike in ***Chaney***, there is no evidence of false testimony or of any ***Brady*** violation, and Dr. West has not recanted his trial testimony.  Instead, Dr. West stated there was nothing presented during the evidentiary hearing that would change or alter his prior testimony given in this case.

¶87.    Additionally, in ***Chaney***, the court noted that without the bite-mark evidence, the State's case "would have been exceedingly feeble because the State could no longer place Chaney at the scene of the crime at the time of the murders." ***Id.*** at 265.  Similarly, in ***Kunco***, the court noted the "crucial" nature of the State's bite-mark evidence. ***Kunco***, 173 A.3d at 824.  And in ***Denton***, the court found that "[a]side from the bite mark evidence, the State presented little other incriminating evidence." ***Denton***, No. 04R-330, at *4.

   III.    *Other Evidence of Howard's Guilt*

¶88.    But here, even without the bite-mark evidence, sufficient evidence established Howard's guilt.  At trial, the evidence showed that at the time of the murder, Howard lived just two blocks away from Kemp. ***Howard***, 853 So. 2d at 785.  Howard's former girlfriend testified that on the morning after the murder, Howard smelled "like burnt clothes or . . . wood, like smoke." ***Id.***  (internal quotation marks omitted).  She further testified that Howard liked to bite her on her neck and breast during intercourse.[9] ***Id.*** at 788.  Moreover, shortly after his arrest, Howard advised law enforcement that the "case was solved" and then confessed to law enforcement that he "had a temper and that's why this happened." ***Id.*** at

---

[9] Dr. Hayne, who performed Kemp's autopsy, testified that "there could be injuries inflicted by teeth."

41

785. Thus, unlike in **Chaney**, **Kunco**, and **Denton**, sufficient evidence other than bite-mark evidence was presented to support the murder conviction.

¶89. Both the majority and the specially concurring opinion challenge the sufficiency of the other evidence of guilt that was presented to support Howard's murder conviction. Maj. Op. ¶¶ 32, 33; Sp. Con. Op. ¶¶ 20, 21. But Howard makes no such argument. Instead, Howard focuses solely on the newly discovered evidence regarding DNA and bite-mark science. The other evidence of guilt is not new evidence. In fact, Howard asserted a sufficiency-of-the-evidence argument on direct appeal in 2003. **Howard**, 853 So. 2d at 788. This Court found sufficient evidence was presented to support his murder conviction. **Id.** Specifically, this Court found,

> the evidence was sufficient to support the conviction even in the absence of fingerprint and DNA evidence. Howard's dentition matched the bite marks found on Kemp's body, *he lived two blocks away from Kemp, his former girlfriend testified that he liked to bite her on the breast and neck during intercourse, he smelled of burnt wood or clothes the morning after the murder, and he confessed to Turner that "I had a temper and that's why this happened."*

**Id.** (emphasis added).

¶90. The sufficiency of the other evidence of guilt against Howard has been previously considered and addressed by this Court. Sufficient evidence other than bite-mark evidence was presented to support the murder conviction.

¶91. I recognize that a change in the ABFO guidelines and in the scientific community's understanding of bite-mark evidence has occurred since Howard's trial in 2000. The trial court properly noted, "[a]s science and technology have progressed in the twenty-six years

since this crime occurred, the standards for bite mark identification have changed also." I further recognize that as a result of these changes, Dr. West would be unable to testify today as he did in 2000. But this does not negate the fact that Dr. West's conclusions at trial were within the guidelines in place at that time. Indeed, even Dr. Pretty acknowledges that "Dr. West's analysis and testimonial conclusions in this case" were "consistent with ABFO guidelines at the time." Dr. West's analysis and conclusions as well as bite-mark science as a whole were questioned and challenged at trial. In other words, although the jury did not hear about the newly discovered evidence Howard relies on in his petition, it did hear about the criticisms of Dr. West and his methodology as well as the unreliability of bite-mark identification.

¶92. Moreover, as previously discussed, other evidence besides bite-mark evidence was presented during trial in support of Howard's guilt. Thus, despite the changes in the ABFO guidelines and in the scientific community's understanding of bite-mark evidence, the newly discovered evidence presented in Howard's petition for post-conviction relief is not of such a nature that it would "probably produce a different result or induce a different verdict[] if a new trial is granted." *Crawford*, 867 So. 2d at 204 (citing *Meeks*, 781 So. 2d at 112). As a result, I find that the trial court properly denied Howard's petition for post-conviction relief and would therefore affirm.